UNITED STATES of America, Plaintiff-Appellee,

v.

Patty McCLAIN, Joseph M. Rodriguez, Ada Eveleigh Simpson, William Clark Simpson and Mike Bradshaw, Defendants-Appellants.

No. 75-3368.

United States Court of Appeals, Fifth Circuit.

Jan. 24, 1977.
Rehearing Denied April 20, 1977.

John E. Clark, U. S. Atty., W. Ray Jahn, Le Roy Morgan Jahn, Asst. U. S. Attys., San Antonio, Tex., for plaintiff-appellee.

James R. McAlee, Rosalind C. Cohen, Patrick F. J. Macrory, Attys., Washington, D. C., for amicus curiae Assoc. of Dealers in Ancient, etc., Art.

Charles E. Biery Court-appointed), San Antonio, Tex., for McClain.

Thomas H. Sharp, Jr. (Court-appointed), San Antonio, Tex., for Rodriguez.

J. Michael Myers (Court-appointed Co-Counsel), O'Neal Munn, Gerry L. Saum, San Antonio, Tex., for Ada Simpson.

James R. Gillespie, San Antonio, Tex., for M. Bradshaw and Wm. C. Simpson.

Edward E. DeWees, Jr., San Antonio, Tex., for Wm. C. Simpson.

Before WISDOM and INGRAHAM, Circuit Judges, and GROOMS,\* District Judge.

WISDOM, Circuit Judge:

■ Museum directors, art dealers, and innumerable private collectors throughout this country must have been in a state of shock when they read the news—if they did—of the convictions of the five defendants in this case.[1] The defendants were

---

\* Senior District Judge for the Northern District of Alabama, sitting by designation.

1. The American Association of Dealers in Ancient, Oriental, and Primitive Art filed an amicus curiae brief under Rule 29, F.R.A.P., with the consent of all parties to the case. The amicus asserts in its brief:

. . . In essence, the decision below has the extraordinary effect of converting the importation into the United States of art works exported without authorization from another country—an act never before regarded as culpable under the law of the United States—into a criminal violation of a federal statute.

. . . The livelihood of the members of the association will be drastically affected if the convictions are upheld. Merely by dealing in art work that have originated—albeit many years earlier—in countries whose laws include broad declarations of national ownership in art, they will be open to charges of receiving and transporting stolen property in violation of federal criminal law.

The case also has broad significance for the public at large. The art institutions of the United States have been able to assemble and exhibit ancient, oriental and primitive art only because it has been entirely lawful under United States law to collect such material, whether or not it was exported from another country in compliance with that country's export restrictions. Indeed, almost all nations which are the source of such art have traditionally attempted to curb the outflow of art by rigid export restrictions, coupled in many cases with broad claims of dominion or ownership of all such art within their territories. Thus far, the United States has refused to accede to the pressure from these art-exporting nations to make it illegal to bring into the United States all art objects exported in violation of their laws. While the United States has been willing to take steps through treaty and statute to discourage the importation of ancient art in select crisis situations, it has not been willing to deprive its museum-going public of the enjoyment of a wide range of ancient, oriental and primitive art on the basis of the policies of other governments.

This long-standing policy of the United States would be reversed by a decision upholding the convictions below. The importation of ancient, oriental and primitive art into the United States would be halted and the flow of such art deflected to other art-importing nations such as West Germany, Switzerland, France and Japan. Even worse, insofar as the decision purports to give effect to Mexican law since 1897, objects of art would now be treated as "stolen" notwithstanding the fact that such a novel interpretation did not obtain when they were originally introduced into the United States. Thus, the lower court's decision would undermine a consistent and long-standing policy of the United States not only for the future, but also retroactively. Museums which have painstakingly assembled extensive collections of ancient, oriental and primitive art for the benefit of the public of the United States would now stand branded as receivers of stolen property. The great concern of the museum community over the implications of the decision below is illustrated by a Statement of Concern unanimously adopted on January 6,

indicted under the National Stolen Property Act, 18 U.S.C. §§ 2314, 2315, and were convicted of conspiring to transport and receiving through interstate commerce certain pre-Columbian artifacts (terra cotta figures and pottery, beads, and a few stucco pieces) knowing these artifacts to have been stolen. These articles had not been registered with the Public Register of Archaeological and Historical Zones and Monuments of the Republic of Mexico, or with any government register, and were exported without a license or a permit from Mexico into the United States. The district court instructed the jury that "since 1897 Mexican law has declared pre-Columbian artifacts . . . to be the property of the Republic of Mexico, except in instances where the Government" has issued a license or permit to private persons to possess, transfer, or export the artifacts. This instruction casts a cloud on the title of almost every pre-Columbian object in the United States. This Court, of course, recognizes the sovereign right of Mexico to declare, by legislative fiat, that it is the owner of its art, archaeological, or historic national treasures, or of whatever is within its jurisdiction; possession is but a frequent incident, not the *sine qua non* of ownership, in the common law or the civil law. The district court's instruction was erroneous. Not until 1972 did Mexico enact a law declaring *all* archaeological objects within its jurisdiction, movables and immovables, to be the property of the Nation. We reverse and remand.

## I.

The National Stolen Property Act (NSPA) prohibits the transportation "in interstate or foreign commerce [of] any goods, . . . of the value of $5,000 or more", with knowledge that such goods were "stolen, converted or taken by fraud". 18 U.S.C. § 2314. The Act also subjects to

criminal liability "whoever receives, conceals, stores, barters, sells, or disposes of any goods . . . of the value of $5,000 or more . . . moving as, or which are part of, or which constitute interstate or foreign commerce, knowing the same to have been stolen, unlawfully converted, or taken . . . ". 18 U.S.C. § 2315. The case turns on whether the pre-Columbian antiquities in question, exported from Mexico in contravention of that country's law, were knowingly "stolen" within the meaning of the National Stolen Property Act.

Patty McClain, Joseph M. Rodriguez, Ada Eveleigh Simpson, William Clark Simpson, and Mike Bradshaw, the defendants-appellants, were all convicted by a jury of conspiring to transport, receive, and sell assorted stolen pre-Columbian artifacts in interstate commerce, in violation of 18 U.S.C. §§ 2314, 2315, and 371. The appellants were also convicted of receiving, concealing, bartering, and selling these items in violation of § 2315. Additionally, Rodriguez was convicted of the transportation of the items in interstate commerce (from Calexico, California to San Antonio, Texas) in violation of § 2314.

Many of the relevant facts are not in serious dispute. The evidence showed that all of the defendants except Rodriguez were involved in negotiations leading to the sale of various pre-Columbian artifacts to prosecution witness John McGauley, an undercover agent of the Federal Bureau of Investigation.

The government presented no evidence as to how and when the artifacts were acquired in Mexico, nor as to when the pieces were exported.

Mrs. Adalina Diaz Zambrano, an employee of the Mexican Cultural Institute in San Antonio, Texas, testified that Rodriguez had approached Albert Mijangos, the Director of the Institute, with a proposal to

1976, by the Council of the American Association of Museums, an organization representing 1,248 individual institutions. The statement concludes that aside from its deleterious effect upon the functioning and staffing of museums, the interpretation of the National Stolen Property Act adopted by the lower court will, if upheld, actually discourage the growing cooperative efforts in international circles to find ways of regulating illegal traffic in cultural property.

sell various artifacts. The Institute was an official arm of the Mexican government, a fact unknown to Rodriguez. Mrs. Zambrano identified, from photographs, artifacts later seized by the government from the other appellants as some of the artifacts shown to her and Mijangos by Rodriguez. In Rodriguez's attempt to sell artifacts to the Institute and in the other defendants' attempt to sell artifacts to McGauley and an informer, some of the defendants made statements showing that they were aware that Mexican law forbade the exportation of artifacts without permits from the Mexican government. After agreeing to a purchase price of $115,000 for the artifacts held in San Antonio, defendants Simpson and Bradshaw brought McGauley to Los Angeles to view other pre-Columbian artifacts. Bradshaw and Simpson told McGauley that they expected to realize about $850,000 for the Los Angeles artifacts. Before a final price was agreed upon they were arrested. The other defendants were arrested in San Antonio.

The defendants do not dispute that the artifacts involved in this case were illegally exported from Mexico. The government contends that the pre-Columbian artifacts were stolen from the Republic of Mexico; that Mexico owned these objects despite the probability or possibility that the defendants, or their vendors, acquired them from private individuals or "found" them—e. g., by accident in overturning the soil or digging at archaeological sites on private property in Mexico.

The primary evidence as to the ownership of the artifacts under Mexican law was the testimony of Dr. Alejandro Gertz, a deputy attorney general of Mexico. He was qualified as an expert on Mexican law without objection. Dr. Gertz had been instrumental in revising Mexican laws dealing with protection of the Mexican cultural heritage and, at the time of trial, his official duties included enforcing that law. Gertz testified that Mexico has had laws protecting its cultural heritage since 1897 and that the most recent modification of those laws was a 1972 statute. Gertz testified that the ownership of pre-Columbian artifacts has been vested by law in the Mexican government since 1897,[2] despite the fact that private individuals have been allowed to possess such items. Since 1934, individuals possessing pre-Columbian artifacts have been required to register them with the government. Export permits have been required since 1934, although since then only 50 to 70 permits have been issued. A check by Gertz of the records of the National Institute of Anthropology and History showed that the defendants had neither registered nor received permission to export the artifacts found in their possession in the United States. Finally, he testified that under Mexican law pre-Columbian artifacts which are removed from Mexico without permit are considered stolen.

Dr. Richard E. Adams, a Professor of Anthropology and Dean of Humanities and Social Studies at the University of Texas in San Antonio, Texas, testified as the other government expert on pre-Columbian artifacts. He testified that Mexican law with respect to pre-Columbian artifacts had not changed in two generations. As will be seen in Section III of this opinion, this belief was erroneous. He testified that some of the artifacts in question were from Guatemala, Honduras, Panama, and Costa Rica, and some were fakes.

The trial court declined to appoint an expert and also an interpreter, as requested by the defendant Rodriguez.

The trial judge instructed the jury that, before it could find any defendant guilty, it had to find beyond a reasonable doubt that the property described in the indictment was "stolen". The judge informed the jury that

> stolen means acquired or possessed as a result of some wrongful or dishonest act of taking, whereby a person willfully obtains or retains possession of property which belongs to another, without or beyond any permission given, and with the

---

2. Ley Sobre Monumentos Arqueológicos, Diario Oficial de Mayo de 1897.

intent to deprive the benefits of owner-ship and use.

Basing his charge on Mexican law as explained by Dr. Gertz, the trial judge instructed the jury that

since 1897 Mexican law has declared pre-Columbian artifacts recovered from the Republic of Mexico within its borders to be the property of the Republic of Mexico, except in instances where the Government of the Republic of Mexico has, by way of license or permit, granted permission to private persons or parties or others to receive and export in their possession such artifacts to other places or other countries.

This erroneous instruction is discussed in Section III of this opinion.

## II.

■ The apparent purpose of Congress in enacting stolen property statutes was to discourage both the receiving of stolen goods and the initial taking. *See United States v. Gardner,* 7 Cir. 1975, 516 F.2d 334, 349, *cert. denied,* 423 U.S. 861, 96 S.Ct. 118, 46 L.Ed.2d 89; *United States v. Bolin,* 9 Cir. 1970, 423 F.2d 834, 838, *cert. denied,* 398 U.S. 954, 90 S.Ct. 1882, 26 L.Ed.2d 297. Such discouragement was, of course, intended to aid the states, which, because of jurisdictional limitations, could not prosecute the receivers or thieves of stolen property after that property moved across state lines. *See United States v. Sheridan,* 1946, 329 U.S. 379, 384, 67 S.Ct. 332, 91 L.Ed. 359; *United States v. Patten,* D.P.R.1972, 345 F.Supp. 967, 968. The ultimate beneficiary of the law, of course, is the property owner who thereby enjoys greater governmental protection of property rights.

Sections 2314 and 2315 refer not only to interstate commerce, but to foreign commerce as well. It is no surprise, then, that the NSPA has been applied to thefts in foreign countries and subsequent transportations into the United States. *See United States v. Rabin,* 7 Cir. 1963, 316 F.2d 564,

cert. denied, 375 U.S. 315, 84 S.Ct. 48, 11 L.Ed.2d 50; *United States v. Greco,* 2 Cir. 1962, 298 F.2d 247, *cert. denied,* 369 U.S. 820, 82 S.Ct. 831, 7 L.Ed.2d 785; *United States v. Hollinshead,* 9 Cir. 1974, 495 F.2d 1154. The Republic of Mexico, when stolen property has moved across the Mexican border, is in a similar position to any state of the United States in which a theft occurs and the property is moved across state boundaries.

First, the appellants contend that application of the National Stolen Property Act to cases of mere illegal exportation constitutes unwarranted federal enforcement of foreign law. They argue that the word "stolen" cannot include the pre-Columbian artifacts seized in this case, for there was no evidence showing that the artifacts had been taken without consent from private individuals or that the artifacts had been in the possession of the Republic of Mexico. Mexican legislative declarations of "ownership" of pre-Columbian artifacts are, the appellants say, not enough to bring the objects within the protection of the NSPA; "possession is the beginning of ownership".[3] This United States statute, the appellants argue, employs the term "stolen" to cover only acts which result in the wrongful deprivation of rights of "ownership" as that term is understood at common law.

Second, the appellants contend that, even if a legislative declaration of ownership would, with export restrictions, invoke the protection of the NSPA, the trial court erred in instructing the jury that Mexico had, since 1897, vested itself with ownership of all pre-Columbian artifacts.

Our consideration of the meaning of the term "stolen" best begins with *United States v. Turley,* 1957, 352 U.S. 407, 411, 77 S.Ct. 397, 1 L.Ed.2d 430. There the Supreme Court was called upon to determine the meaning of that term as used in the Motor Vehicle Theft Act,[4] which prohibits the interstate transportation of "stolen" vehicles. The Court, pointing out that the

---

**3.** *Missouri v. Holland,* 1920, 252 U.S. 416, 434, 40 S.Ct. 382, 384, 64 L.Ed. 641, 648.

**4.** 18 U.S.C. § 2312 (Dyer Act) prohibits the interstate transportation of stolen vehicles.

word "stolen" has no accepted common law meaning and is not a term of art,[5] concluded that "stolen" does not refer exclusively to larcenously taken automobiles; instead, a vehicle that had been rightfully acquired but wrongfully converted by a bailee was held to be "stolen" within the meaning of the Act.

The *Turley* Court cited with approval two National Stolen Property Act cases that had also given the word "stolen" broad scope. *See Crabb v. Zerbst,* 5 Cir. 1939, 99 F.2d 562, 565; *United States v. Handler,* 2 Cir. 1944, 142 F.2d 351, *cert. denied,* 323 U.S. 741, 65 S.Ct. 40, 89 L.Ed. 594.[6] Both cases held that embezzled property was stolen within the meaning of the Act. In *Crabb,* we observed that "stealing" is commonly used to denote any dishonest transaction whereby one person obtains that which rightfully belongs to another and deprives the owner of the rights and benefits of ownership. Post-*Turley* cases have continued to give the term "stolen" a wide-ranging meaning. *See, e. g., United States v. Bottone,* 2 Cir. 1966, 365 F.2d 389, *cert. denied,* 385 U.S. 974, 87 S.Ct. 514, 17 L.Ed.2d 437;[7] *United States v. Vicars,* 6 Cir. 1972, 465 F.2d 720;[8] *Lake v. United States,* 10 Cir. 1964, 338 F.2d 787.[9]

Thus, on one side of the argument we have a federal criminal statute that has been given an expansive scope. On the other side of that argument rests a doctrine of construction fundamental to a society in which governmental interest must be balanced against regard for individual liberty. It is not yet too ritualistic a practice to observe that, throughout our jurisprudence, the courts have considered that "ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity". *Rewis v. United States,* 1971, 401 U.S. 808, 91 S.Ct. 1056, 28 L.Ed.2d 493.

> The rule that penal laws are to be construed strictly, is, perhaps, not much less old than construction itself. It is founded on the tenderness of the law for the rights of individuals.

*United States v. Boston and M. R. R.,* 1965, 380 U.S. 157, 160, 85 S.Ct. 868, 13 L.Ed.2d 728, *quoting United States v. Wiltberger,* 1820, 18 U.S. (5 Wheat.) 76, 5 L.Ed. 37. This ancient precept has continued vitality. *See, e. g., United States v. Bridges,* 5 Cir. 1974, 493 F.2d 918;[10] *Merrill v. United States,* 5 Cir. 1964, 338 F.2d 763.[11]

5. The Court observed that " '[s]teal' (originally 'stale') at first denoted in general usage a taking through secrecy, as implied in 'stealth,' or through stratagem, according to the Oxford English Dictionary. Expanded through the years, it became the generic designation for dishonest acquisition, but it never lost its initial connotation". 352 U.S. at 412, 77 S.Ct. at 399, *quoting Boone v. United States,* 4 Cir. 1956, 235 F.2d 939, 940.

6. *See also Lyda v. United States,* 5 Cir. 1960, 279 F.2d 461, in which we observed that § 2314 reflects a congressional purpose to reach all ways by which an owner is wrongfully deprived of the use or benefit of the use of his property.

7. Copies illicitly made of documents revealing a manufacturing process were "stolen" even though the actual documents were not removed from the possession of the owner.

8. Defendant was held to have "stolen" an airplane by trading for it an airplane that was not airworthy and that was encumbered contrary to the defendant's representations.

9. A defendant who obtained his automobile rightfully but failed to abide by his promise to pay off a finance company was held to have "stolen" the vehicle for the purposes of the Motor Vehicle Theft Act.

10. There we applied the rule of strict construction to 18 U.S.C. § 1955. The statute prohibits the operation of an illegal gambling business that "involves five or more persons" and "has been or remains in substantially continuous operation for a period in excess of thirty days". *Bridges* held that the statute prohibited only those gambling businesses in which five persons participated for thirty days, and not those businesses in which five persons participated at some time and the business itself existed for thirty days.

11. We held that another portion of 18 U.S.C. § 2314, prohibiting the interstate transportation of a "thing" used in falsely making or forging a "security", did not apply to a fraudulent credit card transaction. Observing that ambiguities in criminal statutes are not to be resolved by interpretations embracing offenses not clearly within the law, we held that the term "security" was used in its usual commercial sense to refer to an instrument that in itself is valuable to a thief. A credit sale invoice was not a

■ Of course, the doctrine of strict construction is not absolute. "[T]he intention of the law-maker must govern in the construction of penal, as well [as] other statutes". *Id.* *See also Garrett v. United States,* 5 Cir. 1968, 396 F.2d 489, 491, *cert. denied,* 393 U.S. 952, 89 S.Ct. 374, 21 L.Ed.2d 364; *United States v. Mikelberg,* 5 Cir. 1975, 517 F.2d 246, 252. We cannot accept, therefore, the appellants' initial argument by referring to the doctrine.

■ Nor can the issue in this case be resolved by suggesting that an affirmance condones unwarranted federal enforcement of foreign law. Congress chose to protect property owners living in states or countries hampered by their borders from effectively providing their own protection. The question posed, then, is not whether the federal government will enforce a foreign nation's export law,[12] or whether property brought into this country in violation of another country's exportation law is stolen property. The question is whether this country's own statute, the NSPA, covers property of a very special kind—purportedly government owned, yet potentially capable of being privately possessed when acquired by purchase or discovery. Our examination of Mexican law leads us to reject the appellants' argument that the NSPA cannot apply to illegal exportation of artifacts declared by Mexican law to be the property of the Nation.

■ We do not base this conclusion on illegal exportation of the antiquities. Professor Bator correctly states the law applicable to violations of export laws:

The general rule today in the United States, and I think in almost all other art-importing countries, is that it is not a violation of law to import simply because an item has been illegally exported from another country. This is a fundamental general rule today with respect to art importation. . . . This means that a person who imports a work of art which has been illegally exported is not for that reason alone actionable, and the possession of that work cannot for that reason alone be disturbed in the United States.[13]

This general rule has been qualified by congressional statute and by treaties.[14] But

"security", because it was not inherently valuable. Nor was a credit card, therefore, a "thing" used in falsely making a security. We also observed that Congress could have expressly provided for criminal liability in this area had it so desired; the courts, however, would not search for an intention that the words themselves did not suggest. This is consistent with the statement in *Wiltberger*

that the power of punishment is vested in the legislative, not in the judicial department. It is the legislature, not the court, which is to define a crime, and ordain its punishment. 18 U.S. (5 Wheat.) at 95, 5 L.Ed. 37.

12. We do not mean to imply that there is no possibility that a due process argument in defense could prevail even if, for example, a defendant were prosecuted for removing his own property to this country as a result of a foreign country's national declaration of ownership that did not provide for just compensation or did not comply with other American notions of fundamental fairness. This type of defense was not raised here and we do not, therefore, face the issue.

13. Bator, *International Trade in National Art Treasures: Regulation and Deregulation,* in DuBoff, Art Law, Domestic and International 295, 300 (1975).

14. In 1972 Congress adopted a statute prohibiting the importation into the United States of "stone carvings and wall art which are pre-Columbian monumental or architectural sculpture or murals" from Mexico, Central America, and South America, unless the country of origin certifies the exportation. 19 U.S.C. §§ 2091–2095. The limitation of the statute to "an immovable monument or architectural structure" or a part thereof suggests to the amicus that the national policy is to protect from pillage and mutilation pre-Columbian ceremonial centers and architectural complexes—a narrow class of archaeological objects that would not include the artifacts the defendants here are accused of stealing. Importation of Pre-Columbian Sculpture and Murals; Customs Port Security; Judicial Review in Countervailing Duty Cases, S.Rep.No.92–1221, 92d Cong., 2d Sess. 3 (1972). *See also* Importation of Pre-Columbian Sculpture and Murals, H.R.Rep.No.92–824, 92d Cong., 2d Sess. 3 (1972).

It is also true that the United States has resisted pressure to broaden restrictions on the importation of art from foreign countries. Thus, in 1969, the General Conference of UNESCO produced a draft Convention on the Means of Prohibiting and Preventing the Illicit Import, Export and Transfer of Ownership of Cultural Property. Under that draft, signatory

we cannot say that the intent of any statute, treaty, or general policy of encouraging the importation of art more than 100 years old was to narrow the National Stolen Property Act so as to make it inapplicable to art objects or artifacts declared to be the property of another country and illegally imported into this country.

### III.

The government's expert on Mexican law testified, and the trial court instructed the jury, that Mexico has, since 1897, vested itself with ownership of pre-Columbian artifacts. This testimony and the subsequent instruction, as we pointed out, were in error. Mexican law has been *concerned* with the preservation and regulation of pre-Columbian artifacts since 1897, but ownership of all pre-Columbian objects by legislative fiat, did not come until much later. When it did come, it came, not at once, but in stages.[15]

nations would have committed themselves to make it illegal under their own law to import all art works exported without an export certificate from the territory of another party to the Convention. This draft was "resisted vehemently" by the United States. The United States finally succeeded in deleting the provisions calling for compulsory import provisions and substituting a provision calling for concerted international action, including import controls, only when needed in "crisis" situations. As thus revised, the Senate approved the Convention subject to a number of reservations. Rogers & Cohen, *Art Pillage-International Solutions,* in DuBoff Art Law 315, 317–18 (1975); Note, *The Legal Response to the Illicit Movement of Cultural Property,* 5 Law & Pol. in Int'l Bus., 932, 958–63 (1973); 118 Cong.Rec. 27924–26 (1972); *see* UNESCO Convention on the Means of Prohibiting and Preventing the Illicit Import, Export and Transfer of Cultural Property, 10 Int'l Leg. Mat'ls 289 (1961). *See also* footnote 29.

A number of leading museums have adopted a voluntary policy of purchasing no art or archaeological objects unless they are accompanied by a pedigree: the University of Pennsylvania (1970), Harvard University (with the help of Professor Bator of Harvard Law School, who had participated in the re-drafting of the UNESCO Convention in Paris in 1970); the Field Museum of Natural History in Chicago, the University of California Museum in Berkeley, the Brooklyn Museum, the Arizona State Museum, and the Smithsonian Institution. *See generally,* DuBoff, previously cited; *see particular-*

Article 1 of the Law on Archaeological Monuments, May 11, 1897,[16] did indeed declare that "archaeological monuments" were "the property of the Nation" and that no one could "remove them . . . without express authorization of the Executive of the Union". Archaeological monuments were defined to mean "ruins of cities, Big Houses (Casas Grandes), troglodytic dwellings, fortifications, palaces, temples, pyramids, sculpted rocks or those with inscriptions, and in general all the *edifices* that in any aspect may be interesting for the study of civilization and the history of the ancient settlors of Mexico". The class of objects involved in this case was covered by Article 6, which provided that

Mexican antiquities, codices, idols, amulets and other objects or movable things that the Federal Executive deems interesting for the study of the civilization and history of the aboriginals and ancient settlers of America and especially of

*ly* Hamilton, Museum Antiquities: The Case for Self-Regulation, DuBoff, p. 347, 357.

**15.** Spanish and English versions of the relevant statutory material are presented to this Court in Appendix A of the main brief of the Amicus. Counsel for the Amicus contend that they attempted in vain to secure translations from these other sources—the Library of Congress, the Mexican Embassy, the Organization of American States, the Inter-American Development Bank, the International Congress of Museums, and the American Society of International Law. The translations were finally prepared by counsel for the Amicus, with the help of Tila María Hormazábal de Hancock, an attorney fluent in both English and Spanish and trained in both the civil and common law. Hormazábal de Hancock filed an affidavit with the Court stating that "the translations in Appendix A . . . are complete and accurate translations of those articles and sections of the Mexican statutes to which they pertain . . . and no other articles or sections of these laws are involved in the matters pertinent to this appeal".

The government does not contend that any relevant material has been omitted from the Amicus's selections from the statutes. Nor does the government dispute (with one exception discussed in note 20) the accuracy of the translations.

**16.** Diario Oficial de 11 de mayo de 1897. *See* XIV Anuario de Legislación y Jurisprudencia (1897).

Mexico, cannot be exported without legal authorization.

Nothing in this article constitutes a declaration of ownership. The 1897 law distinguishes between "antiquities . . . or movable things", which are subject to export restrictions, and archaeological monuments. Moreover, even with respect to movable artifacts ("antiquities, codices, idols, amulets and other objects or movable things"), the Federal Executive was obliged first to declare those objects "interesting" for studies of Mexican civilization and history for these objects to be subject to the export regulation under Article 6. We note too that the antiquities were not considered "immovables by destination", a category familiar to civilians.

The next major Mexican law pertaining to pre-Columbian artifacts was the Law on the Protection and Conservation of Monuments and Natural Beauty, January 31, 1930.[17] This law set up a more complicated system of controlling objects of "artistic, archaeological, or historical value". These objects, both movable and immovable, "whose protection and conservation may be of public interest" because of such value, were declared "monuments". Art. 1. For an object to acquire status as a "monument", however, the object either would have to come into the care of the Secretariat of Public Education or be declared a "monument" by the Department of Artistic, Archaeological and Historical Monuments, which was instructed to make the declaration "with precision". Art. 6. But the 1930 law implicitly recognized the right to private ownership of monuments and expressly allowed monuments to be freely alienat-

ed, subject to the government's right of first refusal.[18] Art. 16. Most significantly, ownership was not among the rights the government declared for itself in monuments. The 1930 law was the first to place export restrictions on all objects of the type here involved. The law prohibited the exportation of movables and immovables by destination which had been officially designated as "archaeological monuments", but permitted the exportation of other objects of archaeological value with official permission. Art. 19, 20. This law, therefore, is very different from the law of 1897.

The next relevant enactment came in the Law for the Protection and Preservation of Archaeological and Historic Monuments, Typical Towns and Places of Scenic Beauty, January 19, 1934.[19] Again, "monuments" were regulated and were defined as objects "of archaeological origin and . . . whose protection and preservation are in the public interest, owning to . . . historical value". Art. 1. The 1930 definition of monuments was significantly expanded, however, for the law declared that "all vestiges of the aboriginal civilization dating from before the completion of the Conquest shall be considered as archaeological monuments". Art. 3. The law then declared that

> [a]ll immovable archaeological monuments belong to the nation. Objects *which are found [in or on]* immovable archaeological monuments are considered as immovable property, and they therefore belong to the Nation.

Art. 4 (emphasis added).[20]

It is still clear that not all pre-Columbian artifacts were declared "owned" by the

---

17.  58 Diario Oficial 7, 31 de enero de 1930.

18.  Article 16 provided, in part:

Monuments of ownership or in the control of individuals may be alienated freely, but both the acquirer and the alienator will be obligated to notify the Secretariat of Public Education of the operation and terms on which this was effects, within fifteen days following its execution.

.  .  .  .  .

The Federal Government will have the power to acquire a monument at the same price and subject to the same conditions of the alienation

contract, but must exercise this right within thirty days from the time it receives the notice stated in the first paragraph of the article.

19.  82 Diario Oficial 152, 19 de enero de 1934.

20.  The law in Spanish reads:

Son del dominio de la Nación todos los monumentos arqueológicos inmuebles. Se consideran inmuebles, y por consiguiente pertenecen a la Nación, los objetos *que se encuentren en* monumentos inmuebles arqueológicos.

Mexican government. The 1934 law specifically recognized private ownership of archaeological movables. Article 9 required the "Register of Private Archaeological Property" to maintain a record of movable artifacts "that are the property of private individuals at the time of this law's entry into force and for those which they may legally acquire in the future". No records were maintained, therefore, before 1934. Article 10 recognized that "transfers of ownership: ("propiedad") may be made by the owners of registered objects, but required the transfers to be recorded. The artifacts found in or on immovable monuments form a subset of the set of all pre-Columbian artifacts; those artifacts not in the subclass were not owned by Mexico.

The next Mexican law in this area was the Federal Law Concerning Cultural Patrimony of the Nation, December 16, 1970.[21] This law again declared pre-Columbian archaeological immovables and movables found in or on [22] immovable archaeological objects to be the Cultural Patrimony of the Nation. Art. 52. Such objects could not be permanently exported. Art. 96. The law recognized private ownership of other movable artifacts, while continuing the scheme of registration established by the 1934 Act. Art. 54; Transitory Art. Fifth. Article 54 declares that movable artifacts which are not "unique, rare specimens or of exceptional value for their esthetic quality or for their other cultural qualities . . . can be the object of transfer of ownership". Article 55 creates a presumption that the unregistered movable archaeological objects are "the property of the Nation".

The statutory law shows, therefore, that Mexico did not assert ownership of all pre-Columbian artifacts in 1934. The same situation existed in 1970, when the next law was enacted. Even ethnological, anthropological, and paleontological pieces, which were defined as "articles of cultural value", Art. 3, and were ascribed to the "Cultural Patrimony of the Nation" were capable of being privately owned. *See* Arts. 17, 37.[23]

(Emphasis corresponds to that in text.) The translations provided by the Amicus gives "in" for the Spanish "en". In its translation of the 1970 law, however, the word "on" is given for "en" in the following similar Spanish phrase in Article 52:

> Los bienes arqueológicos inmuebles y los muebles *que en ellos se encuentren,* son propiedad de la nación . . . .

Much is made over this discrepancy by the government, which, with the aid of Cassell's Spanish Dictionary (6th ed. 1968), contends that "in" is correct. *See also* Note, *The Legal Response to the Illicit Movement of Cultural Property,* 5 Law & Policy. in Int'l Bus. 932, 944–45 (1973). The argument is advanced primarily because Dr. Gertz testified that items involved in the instant prosecution are the type usually found in tombs, and because tombs are presumably "immovable archaeological monuments" with the meaning of the statutes. Rogers, *The Legal Response to the Illicit Movement of Cultural Property,* 5 Law & Policy in Int'l Bus. 932, 937 (1973).

Here, we find it unnecessary to decide whether "on" or "in" is correct. Indeed, it appears that "en" should be used in this context to include both concepts. But in light of our holding that the jury must be asked to find *when* the artifacts in question were exported, a new trial will be necessary if the government wishes to continue prosecution. On remand, expert testimony about the meaning of the statute will, we hope, throw more light on the matter.

Objects found in or on a monument might have been, but were not, defined as immovables by destination; presumably, these articles were intended to remain indefinitely in or on the monument. It would be playing fast and loose with words, however, to say that certain objects are found *in* or on monuments, when, for example, the artifacts are found in cenotes, unornamented graves, or on the ground but covered by vegetation; even stelae were usually erected in front of pyramids and temples (although stelae might qualify as monuments or stone carvings).

The movable pre-Columbian artifacts involved in this case could have belonged to the Republic of Mexico had they actually *been found* in immovable monuments. There was no testimony on this question.

21. 303 Diario Oficial 8, 16 de diciembre de 1970.

22. *See* note 20 *supra.*

23. Article 17 provided in part that "private natural persons or corporations, whose objects may be ascribed to the Cultural Patrimony of the Nation, shall retain property rights without limitations other than those established in this Law". Article 37 referred to "[c]ultural objects of private ownership".

Finally, we come to the Federal Law on Archaeological, Artistic and Historic Monuments and Zones, May 6, 1972.[24] Article 27 provides that "[a]rchaeological monuments, movables and immovables, are the inalienable and imprescriptible property of the Nation". Article 28 then establishes that

> [m]ovable and immovable objects, product of the cultures prior to the establishment of the Spanish culture in the National Territory, . . . are archaeological monuments.

This law unequivocally establishes for the first time what Dr. Gertz testified had been the case since 1897. Only after the effective date of the 1972 law would the Republic of Mexico necessarily have ownership of the objects such as the artifacts involved in this case. This legislation "extended national ownership of the cultural patrimony to private collections and forbade absolutely the export of pre-Columbian items".[25] The law was adopted only after "a bitter constitutional debate" over the extension of public control over private property.[26] A grandfather clause protected pre-existing private ownership rights. Transitory Article Fourth. Moreover, Article 22 requires individuals to register monuments "of their ownership".

The Amicus states that this view is confirmed by the formal opinion of the Mexican Bar, which reviewed the 1972 statute prior to its enactment. *See* opinión de la Barra Mexicana Sobre La Iniciativa de Ley Federal Sobre Monumentos Arqueológicos, artísticos, Históricos y Zonas Monumentales [Opinion of the Mexican Bar on the Proposed Federal Law on Archaeological, Artistic, and Historical Monuments and Monument Zones], 5 El Foro No. 26 (Organo de la Barra Mexicana, Colegio de Abogados) 121, 124–25 (abril-junio, 1972): ". . . the Laws [prior to 1972] . . . established public ownership or general use *only* over archaeological immovable monuments and . . . movables found on them . . . . [I]t is of major relevance to point out that *all this legislation permitted, recognized and protected private ownership over movable* archeological monuments . . . ." [Translation from the Spanish, emphasis supplied.][27]

■ We find as a matter of law that the district court erred by instructing the jury in accordance with Dr. Gertz's testimony. *See* Fed.R.Crim.P. 26.1 (Determination of Foreign Law); *cf. First National City Bank v. Campania de Aguaceras, S. A.,* 5 Cir. 1968, 398 F.2d 779, 781–82.

The court's instruction that the Mexican government had owned the artifacts for over seventy-five years was highly prejudicial to the defendants. It could have been the decisive factor in the jury's inferring that the defendants must have known that the artifacts in question were stolen.

### IV.

■ This review of the relevant Mexican statutes demonstrates that the Mexican government has, since 1897, been staking out for itself greater and greater rights in pre-Columbian artifacts. Only in 1972, however, did the government declare that *all* pre-Columbian artifacts were owned by the Republic. We hold that a declaration of national ownership is necessary before illegal exportation of an article can be considered theft, and the exported article considered "stolen", within the meaning of the

---

**24.** 312 Diario Oficial 16, 6 de mayo de 1972.

**25.** Rogers, *The Legal Response to the Illicit Movement of Cultural Property,* 5 Law Policy in Int'l Bus. 932, 945 (1973); Nafziger, *Controlling the Northward Flow of Mexican Antiquities,* 7 Lawyer of the Americas, 68, 71 (1975).

**26.** Nafziger, *Controlling the Northward Flow of Mexican Antiquities,* 7 Lawyer of the Americas, 68, 71 (1975). "The law's effect is to foreclose the legitimate export of Mexican cultural property and to encourage a black mar-

ket". *Id.* at 71. "Mexico has taken a giant step backward, reentrenching regulatory methods which have long been discredited". Rogers and Cohen, *Art Pillage—International* in DuBoff, Law and the Visual Arts, 281, 287 (1974). We quote these statements only to show that experts on the subject recognized that the 1972 law was completely different from all previous Mexican laws on the subject.

**27.** Amicus Brief, p. 31, 32.

National Stolen Property Act.[28] Such a declaration combined with a restriction on exportation without consent of the owner (Mexico) is sufficient to bring the NSPA into play.[29]

This conclusion is a result of our attempt to reconcile the doctrine of strict construction of criminal statutes with the broad significance attached to the word "stolen" in the NSPA. Were the word to be so narrowly construed as to exclude coverage, for example, with respect to pre-Columbian artifacts illegally exported from Mexico after the effective date of the 1972 law, the Mexican government would be denied protection of the Act after it had done all it reasonably could do—vested itself with ownership—to protect its interest in the artifacts. This would violate the apparent objective of Congress: the protection of owners of stolen property.[30] If, on the oth-

28. *United States v. Hollinshead*, 9 Cir. 1974, 495 F.2d 1154, is cited by the appellees as the case most on point supporting the instant convictions. There the defendant was successfully prosecuted for transporting into the United States a famous pre-Columbian stela. Stelae, arguably, are covered by the 1897 law. The stela, known as Machaquila Stela 2, was taken from Guatemala. The stela was shaved ("thinned") to reduce its weight and was cut into 19 pieces for convenience in handling. Anyone would have known that it was stolen. The court observed that "all such artifacts are the property of the Republic". Whether the court was correct in its observation is immaterial here, because our independent examination of Mexican law does not allow us to make the same observation without knowing when the artifacts in this case were exported. *Hollinshead* does, however, support our conclusion that a declaration of national ownership suffices to render an illegally exported item "stolen". *See* Merryman, *The Protection of Artistic National Patrimony Against Pillaging and Theft*, in DuBoff, Art Law, Domestic and International 245 (1975).

29. Our conclusions with respect to the applicability of the NSPA to illegally exported artifacts are supported by the comments of the United States Department of State to the United Nations Educational, Scientific, and Cultural Organization's (UNESCO) Convention on the Means of Prohibiting and Preventing the Illicit Import, Export, and Transfer of Ownership of Cultural Property, Nov. 14, 1970, 10 Int'l Legal Materials 289 (1971). *See generally* Comment, *The UNESCO Convention on the Illicit Movement of Art Treasures*, 2 Harv. Int'l J. 537 (1971). Countries were to provide importation restrictions for property "stolen from a museum or a religious or secular public monument or similar institution", UNESCO Convention, art. 7(b)(i), and penal or administrative sanctions were to be provided against violators of such restrictions, *id.* art. 8. The State Department responded that

> [t]he laws of the United States, and presumably the laws of most states, prohibit the theft and the receipt and transportation of stolen property. . . . See title 18, U.S.Code, secs. 2314–15.

S.Exec.Rep. No. 29, 92nd Cong., 2d Sess. 17, at 21 (1972). The Senate adopted the Convention on August 11, 1972, by a vote of 79 to 0. 118 Cong.Rec. 13, 378–79 (daily ed.). For a comprehensive discussion of the Convention and other efforts in the international community to deal with the problem of preserving national patrimony, see Note, *supra* note 18.

30. The appellants cite *Jerome v. United States*, 1943, 318 U.S. 101, 104, 63 S.Ct. 483, 87 L.Ed. 640, which established that federal criminal statutes should not, in the absence of express legislative authorization, be interpreted according to diverse state laws. By analogy, then, it is asserted that "the meaning of 'stolen' cannot be permitted to rest upon the far more diverse and less understandable laws of foreign nations".

This ingenious argument misses the mark. In *Jerome*, the federal statute, 12 U.S.C. § 588d, amended eff. Sep. 1, 1948, 62 Stat. 862 *now codified* at 18 U.S.C. § 2113 made it a crime to "enter any bank, . . . with intent to commit in such bank . . . any felony or larceny". The defendant was convicted of entering a Vermont bank with the intent of uttering a forged promissory note; false uttering was a Vermont felony but not a federal felony. The Court rejected the government's argument that the statute could be construed to refer to state-defined felonies. The statute was to have nationwide application, and it was desirable that the statute be uniformly construed.

The reasoning of *Jerome* does not support the appellants' position here. We suggest that the key to *Jerome* is that behavior punishable in one state would not be punishable in another state. Here, our decision to refer to foreign declarations of ownership does not create the state-by-state divergence avoided in *Jerome*. It poses the possibility, of course, that similar exportations from different countries might lead to different results in the United States. But the National Stolen Property Act has a specific scienter requirement—knowledge that stolen goods are stolen—that protects a defendant who might otherwise be trapped by such differences.

The appellants also argue that a reference to foreign law for the purposes of determining

er hand, an object were considered "stolen" merely because it was illegally exported, the meaning of the term "stolen" would be stretched beyond its conventional meaning. Although "stealing" is not a term of art, it is also not a word bereft of meaning. It should not be expanded at the government's will beyond the connotation—depriving an *owner* of its rights in property—conventionally called to mind.[31]

■ We distinguish, therefore, between varying types of governmental control over property within the borders of a state. All property is presumably within a state's police power: a state may prohibit the sale of firearms to convicted felons; it may regulate the price charged for electric power; it may prohibit the use of a privately owed manufacturing plant in a racially discriminatory manner; it may require some private parties to sell their railroads to other private parties. But the state's power to regulate is not ownership. Nor does the fact that a state has regulated an object in and of itself constitute ownership.

■ To be sure, the pre-Columbian artifacts regulated by Mexico seem to be in a different position from firearms, electric power, manufacturing plant, and railroads. Because the artifacts cannot lawfully be taken from the country, without an export license they appear more "owned" than the other types of property. This appearance reflects the confusion of ownership with possession. Separating a piece of property from a country is analogous to depriving that country of possession over the property, because it deprives the country of jurisdiction over the property. Exportation restrictions guard that jurisdiction and power. But, except for this effect on jurisdiction, restrictions on exportation are just like any other police power restrictions. They do not create "ownership" in the state. The state comes to own property only when it acquires such property in the general manner by which private persons come to own property, or when it declares itself the own-

what is or is not "stolen" "would inject an unacceptable degree of uncertainty into the administration" of the National Stolen Property Act. This appears to be an argument that the application of the NSPA to foreign exportations makes the NSPA void for vagueness. We reject this argument. Again, the specific scienter requirement eliminates the possibility that a defendant is convicted for an offense he could not have understood to exist. *Cf. Boyce Motor Lines v. United States*, 1952, 342 U.S. 337, 340, 72 S.Ct. 329, 331, 96 L.Ed. 367 (it is not "unfair to require that one who deliberately goes perilously close to an area of proscribed conduct shall take the risk that he may cross the line"). Moreover, the broad remedial purposes of the stolen property acts require, as we have shown in text, that the word "stolen" be broadly construed. It would have been impossible for the statutes to have explicitly described every type of theft that might fall within their purview.

Finally, the appellants argue that an asserted national policy of encouraging the importation of works of art precludes the application of the National Stolen Property Act in this area. Assuming that there is such a national policy, we note that there is also a national policy to penalize those who trade in stolen merchandise. It is within the power accorded to the executive branch of government to say when the policy embodied in the criminal statute should prevail and prosecution be instituted.

*See United States v. Cox*, 5 Cir. 1965, 342 F.2d 167 (en banc), *cert. denied*, 381 U.S. 935, 85 S.Ct. 1767, 14 L.Ed.2d 700.

**31.** We reject the government's argument that reasoning in *United States v. Plott*, S.D.N.Y. 1972, 345 F.Supp. 1229, 1232, requires affirmance of the instant convictions. In *Plott*, the defendant was charged with violating § 2314 by transporting from Alabama to New York alligators that were poached in contravention of Alabama law. The court rejected the defendant's argument, in his motion to dismiss the charges for failure to state an offense, that poaching was not "stealing" within the meaning of the statute. The basis of this rejection was twofold. First, *Geer v. Connecticut*, 1896, 161 U.S. 519, 529, 16 S.Ct. 600, 40 L.Ed. 793, was cited for the proposition that a state does own wildlife in its sovereign capacity. Second, the defendant's argument was unpersuasive in that "the act of stealing is as much defined by the taker's intent to keep property to which he has no right as it is by esoteric questions of legal title in others. 345 F.Supp. at 1232. Only this second theory pertains to our case. But as the court itself pointed out, this reasoning amounted merely to "semantic analysis". The court refused to rest on such semantic analysis, and its reasoning, therefore, is merely dictum. Finally, we suggest that the reasoning is not persuasive.

er;[32] the declaration is an attribute of sovereignty.

We summarize, then, how these conclusions square with Mexican law as we understand it. In order to say whether any of the pre-Columbian movable artifacts were "stolen", it is necessary to know first when that artifact was exported from Mexico.[33] If the exportation occurred after the effective date of the 1972 law, the artifact may have been stolen—but only if it were not legitimately in the seller's hands as a result of prior law. (Transitory Article Fourth). If the exportation occurred before 1972, but after the effective date of the 1934 law, it would be necessary to show that the artifact was found on or in an immovable archaeological monument. If the exportation occurred before the effective date of the 1934 law, it could not have been owned by the Mexican government, and illegal exportation would not, therefore, subject the receiver of the article to the strictures of the National Stolen Property Act. Because the jury was not told that it had to determine when the pre-Columbian artifacts had been exported from Mexico and to apply the applicable Mexican law to that exportation, convictions of all the appellants must be reversed.

The government argues, however, that, even if the 1972 law was the first to make every pre-Columbian artifact in Mexico the property of the nation, the error in the trial court's jury instruction amounts merely to harmless error. The appellee points to the fact that the effective date of the 1972 law appears to have been June 5, 1972 (*see* Transitory Article First) whereas the pre-Columbian artifacts are known to have been in the United States in May 1973. The government suggests, then, that the "evidence . . . compelled the inference of recent exportation", (Br. at 27) *i. e.* exportation after June 5, 1972.

When the jury is not given an opportunity to decide a relevant factual question, it is not sufficient "to urge that the record contains evidence that would support a finding of guilt even under a correct view of the law". *United States v. Casale Car Leasing Inc.,* 2 Cir. 1967, 385 F.2d 707, 712. The jury here was the only body that could have properly made the inference of "recent exportation" and a holding by us to the contrary would, by supplanting our determination for the jury's verdict, deprive the defendants of their right to a jury trial. Under a proper view of the law, it is extremely important to the issue of guilt or innocence for the jury to know or to make a fair inference as to just when the artifacts were exported. Accepting the government's argument would be tantamount to affirming a conviction in which the trial court had instructed the jury that "the artifacts were obviously recently exported". This, however, is the kind of judicial error that cannot be found

---

**32.** The discussion of Italian law in Merryman, note 28 at 239–41, 244 supports our conclusion that exportation restrictions in and of themselves do not create national ownership in artifacts. *See also* Comment, note 29 at 540–41. Moreover, the Act to Prevent Importation of Pre-Columbian Sculpture and Murals, Act of Oct. 27, 1972, Pub.L. No. 92–587, tit. II, 86 Stat. 1297, *codified* at 19 U.S.C. §§ 2091–95, suggest Congressional awareness of this distinction. The Act makes illegal importation of pre-Columbian monumental or architectural sculpture unlawfully exported from a country of origin. *See* Note, *supra* note at 939–42. If all illegally exported artifacts were "stolen", the NSPA would, of itself have proscribed such importation, and, except for portions of the 1972 statute that provide for seizure, storage, and return of contraband, the statute would have been superfluous.

**33.** The date of exportation is focused on because illegal exportation constitutes a sufficient act of conversion to be deemed a theft. Of course, owned property may have been illegally taken or converted before exportation, e. g., by discovering and failing to register an artifact or by an unlawful transfer. If so, such property might be subject to the NSPA even if there were no exportation restrictions and it is immaterial to determine whether the artifacts could have been deemed "stolen" before they left Mexico. If the artifacts were stolen before exportation, they still constituted stolen goods after exportation. If Mexican law became more stringent after artifacts were illegally concealed within Mexico but before exportation, the illegal exportation is the act, if any, that renders them stolen.

**1004**

harmless notwithstanding the strength of the evidence against the defendants. *See Roe v. United States*, 5 Cir. 1961, 287 F.2d 435, 438, *cert. denied*, 368 U.S. 824, 82 S.Ct. 43, 7 L.Ed.2d 29; *Carothers v. United States*, 5 Cir. 1947, 161 F.2d 718, 722.

■ As the Court of Appeals for the Seventh Circuit said in *United States v. England*, 7 Cir. 1965, 347 F.2d 425, 430:

the defendant has an absolute right to a jury determination upon all essential elements of the offense. This right, emanating from the criminal defendant's constitutional right to trial by jury, is neither depleted nor diminished by what otherwise might be considered the conclusive or compelling nature of the evidence against him.

*See also United States v. O'Dell*, 6 Cir. 1972, 462 F.2d 224; *United States v. Hayward*, 1969, 136 U.S.App.D.C. 300, 420 F.2d 142, 144; *United States v. Fueston*, 9 Cir. 1970, 426 F.2d 785; *United States v. Manuszak*, 3 Cir. 1956, 234 F.2d 421.[34]

## V.

There is one issue raised that is not necessary for us to reach but which may arise in the context of a retrial.

The appellants contend that the value of the artifacts could not be proved except by evidence showing value at the time and place of theft, *citing Herman v. United States*, 5 Cir. 1961, 289 F.2d 362, *cert. denied*, 368 U.S. 897, 82 S.Ct. 174, 7 L.Ed.2d 93. The government's evidence tended to show the value of the artifacts after exportation, *i. e.* while sales were being negotiated to undercover agents. As we have already observed, it is not clear how much time elapsed between exportation and the appearance of the artifacts in San Antonio and Los Angeles.

■ In *Herman*, the question the Court faced was whether it was proper, in computing the value of stolen goods, to include a mark-up to retail value. This question was answered affirmatively. It is true, we observed that

[t]he standard test for determining market value of stolen property is the price a willing buyer would pay a willing seller at the time and place the property was stolen.

*Id.* at 366. We now emphasize that the willing buyer-willing seller formula need not always be confined to the time and place of theft.[35] Instead, as we have once before observed, value may be determined at any time during the receipt or concealment of stolen property. *See United States v. Nall*, 5 Cir. 1971, 437 F.2d 1177, 1187; *accord, United States v. Riso*, 7 Cir. 1968, 405 F.2d 134, 137, *cert. denied*, 394 U.S. 959, 89 S.Ct. 1306, 22 L.Ed.2d 560; *United States v. Gardner*, 7 Cir. 1975, 516 F.2d 334, 349, *cert. denied*, 423 U.S. 861, 96 S.Ct. 118, 46 L.Ed.2d 89; *United States v. Tauro*, W.D.Pa.1973, 362 F.Supp. 688, 691–92, *aff'd*, 3 Cir. 1974, 493 F.2d 1402.

The convictions are reversed. The cases are remanded for further proceedings not inconsistent with this opinion.[36]

REVERSED AND REMANDED.

---

**34.** *See also Bollenbach v. United States*, 1946, 326 U.S. 607, 614, 66 S.Ct. 402, 90 L.Ed. 350, in which the Supreme Court stated that "the question is not whether guilt may be spelt out of a record, but whether guilt has been *found by a jury* according to the procedures and standards appropriate for criminal trials in the federal courts". (Emphasis added.)

**35.** We have applied this principle to 18 U.S.C. § 641, which prohibits theft from, and receipt of property stolen from, the United States, and which allows a much more severe penalty than otherwise when the value of the property is more than $100. *See United States v. Kramer*, 2 Cir. 1961, 289 F.2d 909, 921; *Jalbert v. United*

States, 5 Cir. 1967, 375 F.2d 125, 126, *cert. denied*, 389 U.S. 899, 88 S.Ct. 225, 19 L.Ed.2d 221; *United States v. Tyler*, 9 Cir. 1972, 466 F.2d 920, 921, *cert. denied*, 409 U.S. 1045, 93 S.Ct. 544, 34 L.Ed.2d 497. In *Kramer*, Judge Friendly declared that

[i]t is not essential that the stolen property be worth $100 at the moment of receipt; it is enough if there is evidence that the property had that value at some time when there occurred an offense defined in the statute, charged in the indictment, and proved by the evidence.

**36.** The appellants raised many other points of error that we do not deal with in this opinion, for example, the lack of evidence of a conspir-

acy. They also argued that the district court erred in failing timely to supply a copy of the Mexican statute or statutes on which the government intended to rely, in refusing to grant an eve-of-trial continuance to the defendants when the prosecution failed to produce copies of the pre-1970 Mexican laws, in failing to appoint an interpreter for Rodriguez for the purpose of translating Mexican statutes into English, and in refusing to appoint an expert in Mexican law and pre-Columbian artifacts. The question of the need for a continuance is, of course, no longer an issue in light of our reversal of the convictions. The need for experts and interpreters at a new trial will be governed by different factors from those that existed at the first trial. We consider it inappropriate to comment prospectively on matters substantially within the discretion of the trial court. We consider it appropriate, however, to observe that Dr. Gertz, because of his official position with the Mexican government, was necessarily a biased witness. Another and more objective expert would have lightened the task of the district court and of this Court. As it was, we had to rely to a great extent on the helpful brief of counsel for the amicus, who was, however, at least as much a friend of dealers in pre-Columbian objects as a friend of the court.