UNITED STATES of America,

v.

Frederick SCHULTZ, Defendant.

No. 01 CR 683 JSR.

United States District Court, S.D. New York.

Jan. 3, 2002.

Marcia Isaacson, New York City, Peter Neiman, New York City, for U.S.

Linda Imes, Daniel C. Zinman, Richards Spears Kibbe & Orbe, New York, NY, for defendant.

## OPINION AND ORDER

RAKOFF, District Judge.

The marvelous artifacts of ancient Egypt, so wondrous in their beauty and in what they teach of the advent of civilization, inevitably invite the attention, not just of scholars and aesthetes, but of tomb-robbers, smugglers, black-marketeers, and assorted thieves. Every pharaoh, it seems, has a price on his head (at least if the head is cast in stone); and if the price is right, a head-hunter will be found to sever the head from its lawful owner. So, at least, is the theory of the instant indictment, which alleges, in effect, that the defendant and one or more co-conspirators arranged to steal highly valuable ancient Egyptian artifacts—including a million-dollar head of Amenhotep III—and "fence" them in New York. This, says the indictment, makes the defendant guilty of conspiracy to violate section 2315 of Title 18, United States Code, which provides, in pertinent part, that "[w]hoever receives, possesses, conceals, stores, barters, sells, or disposes of any goods, wares, or merchandise ... which have crossed a State or United States boundary after being stolen ... knowing the same to have been stolen ... [is guilty of a crime]."

The defendant has pleaded not guilty and is presumed innocent. For purposes of this pre-trial motion, however, he assumes the facts as stated in the indictment and maintains that the indictment nonetheless fails to state a conspiracy to violate section 2315 because it presupposes, wrongly in his view, that someone who conspires to smuggle ancient artifacts out of Egypt is thereby guilty of, among other things, dealing in stolen goods, by virtue of Egyptian Law 117. *See* Indictment ¶¶ 1–6. That law provides that, as of 1983, all Egyptian "antiquities"—that is, objects over a century old having archeological or historical importance (Law 117, Art. 1) [1]— "are considered to be public property," that is, property of the state. Law 117, Art. 6. The defendant principally argues: (i) that Law 117, despite its assertion of state ownership, is really more in the nature of a licensing and export regulation, the violation of which does not constitute theft of property in the sense covered by section 2315; (ii) that, assuming Law 117 really does work an expropriation of property by Egypt, the special kind of property thereby vested in that foreign state does not give rise to interests entitled to protection under United States law; and (iii) that even if such foreign interests might sometimes be entitled to such protection, here

---

**1.** While the defendant expends much time and energy in arguing that the definition of "antiquities" under Law 117 is too vague to afford fair notice of what is covered and what is not, none of the ancient Egyptian artifacts that is the subject of the instant indictment (and corresponding bill of particulars)—such as a pharaoh's head and two old Kingdom painted reliefs, *see* Indictment, ¶¶ 8(a),8(g)—remotely raises questions of fair notice under any reasonable interpretation of that definition. That a definition may be fuzzy around the edges does not render it meaningless, or inapplicable to what it clearly covers at its core.

Congress, in enacting the Cultural Property Implementation Act of 1983, 19 U.S.C. §§ 2601 *et seq.*, chose to substitute a civil enforcement regime for criminal prosecution.

■ The primary problem with defendant's first argument—that Law 117 is really regulatory in nature—is the language of the law itself, which unequivocally asserts state ownership of all antiquities (Art. 6), requires their recording by the state (Art. 26), prohibits (with certain practical exceptions) private ownership, possession, or disposal of such antiquities (Arts.6–8), and requires anyone finding or discovering a new antiquity to promptly notify the Antiquities Authority (Arts.23–24), which, in the case of movable antiquities, then takes physical possession and stores the antiquities in the museums and storage facilities of the Authority (Art. 28). Thus, so far as Egyptian antiquities are concerned, Law 117 on its face vests with the state most, and perhaps all, the rights ordinarily associated with ownership of property, including title, possession, and right to transfer. This, on its face, is far more than a licensing scheme or export regulation.

To be sure, Law 117 qualifies certain aspects of state ownership where obvious practicalities so require. For example, while every newly-discovered but immovable antiquity is still deemed state owned, nonetheless "where the find is located on private property, the Authority shall decide within three months whether to remove the find, to initiate measures for expropriating the land upon which it is located, or to leave the antiquity in its place and register it in accordance with the provisions of this law." (Art. 23). Similarly, pre–1983 owners or possessors of antiquities, though now required to register their antiquities with the state if they have not already done so, may in certain circumstances maintain possession or even dispose of their antiquities, but only with permission of the Authority. *See, e.g.* Arts. 7, 8, 9, 13. These adjustments to physical and historical circumstances only serve to confirm, however, that the statute's primary purpose is to transfer ownership to the state to the extent reasonably practicable.[2]

Despite the plain language of Law 117, however, defendant argues that, in practice, even those antiquities discovered after 1983 have been left in the hands of their discoverers or other private transferees and that the law in operation really works more like a licensing or export regulation than like a transfer of property. But when, in response to these and other defense assertions, the Court convened an evidentiary hearing, pursuant to Rule 26.1 of the Federal Rules of Criminal Procedure, the defendant was unable to adduce any material, let alone persuasive evidence to support this contention. The most he could offer in this respect was the opinion of Professor Abou El Fadl, a professor of Islamic and Middle Eastern law at UCLA Law School, to the effect that nothing in Law 117 definitively prevents the Antiquities Authority from leaving physical possession of even an antiquity discovered after 1983 in the hands of a private finder, so long as the private finder promptly notifies the Authority of his find. *See* transcript of hearing of November 20, 2001 ("Tr."), at A20.[3]

---

**2.** Moreover, the conspiracy here alleged relates only to movable antiquities, and the Government has formally disclaimed any intention to argue to the jury that the defendant knew that any pre–1983 antiquities were sto-len. *See* Government's Post–Hearing Memorandum In Opposition to Defendant's Motion to Dismiss the Indictment, at 3 fn.2.

**3.** The transcript pages of the first portion of the November 20 hearing, taken by the Court

In response to this purely hypothetical opinion, the Government presented, among much else, the testimony of Dr. Gaballa Ali Gaballa, Secretary General to the Supreme Council of Antiquities, that in fact the state takes immediate physical custody of newly discovered antiquities, sometimes by the tens of thousands, tr. A77–79. Another Government witness, General Ali Sobky, Director of Criminal Investigations for the Antiquities Police (which employs more than 400 police officers), testified that his department regularly investigates and prosecutes dozens of serious violations of Law 117, of which relatively few are for smuggling and most are for trafficking within Egypt (including unlawfully possessing and disposing of state-owned antiquities), tr. B51–55.[4] General Sobky also testified that even in the case where someone is acquitted of stealing a newly discovered antiquity, the antiquity is confiscated by the state as the lawful owner, tr. B69.

It is clear, therefore, that Law 117, far from being a disguised licensing scheme or export regulation, is precisely what it purports to be: a transfer of ownership of Egyptian antiquities to the state, effective 1983.

As for defendant's second argument—to the effect that American law does not, or should not, recognize the kind of "special" property interest created by "patrimony" laws like Law 117, *see United States v. McClain*, 545 F.2d 988, 994 (5th Cir.1977) (Wisdom, J.) (rejecting such an argument)—it should first be noted that section 2315, which expressly refers to foreign commerce, has consistently "been applied to thefts in foreign countries and subsequent transportation into the United States," *McClain*, 545 F.2d at 994 (citing cases): an implicit recognition of the interest of the United States in deterring its residents from dealing in the spoils of foreign thefts. In effectuating this policy, why should it make any difference that a foreign nation, in order to safeguard its precious cultural heritage, has chosen to assume ownership of those objects in its domain that have historical or archeological importance, rather than leaving them in private hands?[5] If an American conspired to steal the Liberty Bell and sell it to a foreign collector of artifacts, there is

---

Reporters, are denoted "A" followed by the page number. The transcript pages of the second portion of the November 20 hearing, originally taped and then transcribed by the Transcription Service, are denoted "B" followed by the page number.

4. The defendant objected to certain of this testimony on hearsay and "due process" grounds, as well as on the ground that the underlying Egyptian documents that General Ali El Sobky summarized were not made available to the defendant. However, a "court, in determining foreign law, may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence." Rule 26.1, Fed.R.Crim.P. At the November 20 hearing, the Court reserved on defendant's objections until the defendant had been provided with the underlying documents and had had a further opportunity to brief his objections. This having been done

(*see, e.g.*, Government's letter of December 18, 2001 and attachments thereto), the Court hereby determines that the objected-to evidence shall be received. It may also be noted that, even if the Court were to exclude this evidence, that would in no way change the result, since the provisions of Law 117 transferring ownership and right to possession to the state (which, contrary to defendant's argument, the Court finds to be unambiguous) must be presumed to be in force unless the defendant comes forward with at least some material evidence to the contrary—which, as noted, he has wholly failed to do.

5. Egyptian law, like United States law, requires just compensation for takings, tr. A57. Accordingly, Law 117 expressly provides for full compensation to those who owned Egyptian antiquities prior to the state's assumption of ownership in 1983 or, even thereafter, to those whose land the state chooses to take by eminent domain in order to preserve the im-

no question he could be prosecuted under section 2315. *Mutatis mutandis*, the same is true when, as here alleged, a United States resident conspires to steal Egypt's antiquities.

To be sure, even if the Government proves the defendant knew he was importing antiquities that were smuggled out of Egypt—an act that may not be inherently violative of United States law and policy, *see McClain*, 545 F.2d at 996—there may still be a jury question as to whether he knew he was dealing in stolen goods, an essential element of a section 2315 violation. But the indictment alleges he possessed such knowledge, and the Government asserts that it will prove, *inter alia,* that the defendant knew that at least two of the items he conspired to import had been stolen from the Antiquities Police. This is more than sufficient for purposes of the present motion.

■ Finally, as for defendant's argument that the Cultural Property Implementation Act of 1983, a civil customs law, somehow supersedes section 2315 when applied to the same subject matter, suffice to say that there is nothing in the language or the history of the Cultural Property Implementation Act to support this unlikely result. On the contrary, the Senate, in reporting out the Cultural Property Implementation Act, expressly stated that the Act "neither pre-empts state law in any way, nor modifies any Federal or State remedies ...." S.Rep.No. 97–564, at 25 (2d Sess.1982).

Nor, indeed, is there any inconsistency between the application of the Cultural

Property Implementation Act and the application of section 2315 to the "cultural property" involved in this case. *See United States v. Stephenson,* 895 F.2d 867, 872 (2d Cir.1990). The Cultural Property Implementation Act, rather than banning the importation of all cultural property exported in violation of foreign law, takes a more nuanced and complicated approach to when and under what circumstances such property can be imported into the United States; but this is because the Act is chiefly concerned with balancing foreign and domestic import and export laws and policies, not with deterring theft. Section 2315, by contrast, only applies in cases of intentional theft and knowing disposal of stolen goods, a situation in which even the primary academic proponent of the Cultural Property Implementation Act has stated that criminal prosecution is appropriate. *See* Paul M. Bator, *An Essay on the International Trade in Art,* 34 Stan. L.Rev. 275, 353 (1982).

While defendant raises still other arguments in support of his motion to dismiss the indictment, the Court finds them sufficiently meritless as not to warrant discussion here.[6]

Accordingly, the Court, confirming its Order of December 27, 2001, hereby denies defendant's motion to dismiss the indictment.

SO ORDERED.

movable antiquities upon it. *See, e.g.*, Arts. 7, 13, 14, 16, 25. Furthermore, even those persons who discover antiquities after 1983 and are therefore on notice of the state's ownership qualify, in the discretion of the Antiquities Authority, for financial rewards for their efforts. *See* Arts. 23, 24.

**6.** For example, the fact that an Egyptian court, in connection with a criminal prosecution of certain of defendant's co-conspirators, did not name the defendant as a co-conspirator, in no way constitutes, as defendant here argues, a judicial determination of defendant's innocence binding on this Court. Defendant, indeed, was not even a party to the other proceeding.