**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Patty McCLAIN, Mike Bradshaw, Ada Eveleigh Simpson and William Clark Simpson, Defendants-Appellants.**

No. 77–5690.

United States Court of Appeals, Fifth Circuit.

April 23, 1979.

Rehearings Denied June 22, 1979.

---

**659**

Charles E. Biery, San Antonio, Tex. (Court-appointed), for McClain.

Pat Priest, San Antonio, Tex. (Court-appointed), for Bradshaw.

O'Neal Munn, San Antonio, Tex., for A. Simpson.

John S. Broude, Fort Worth, Tex. (Court-appointed), for Wm. Clark Simpson.

James R. McAlee, Washington, D. C., Jamie C. Boyd, U. S. Atty., LeRoy M. Jahn, W. Ray Jahn, Asst. U. S. Attys., San Antonio, Tex., for plaintiff-appellee.

Before GEWIN, RONEY and GEE, Circuit Judges.

GEE, Circuit Judge:

Again before us come Patty McClain, Mike Bradshaw, Ada Simpson and William Simpson, challenging their second round of convictions for having received, concealed and/or sold stolen goods in interstate or foreign commerce and also for conspiracy to do the same, violations of 18 U.S.C. §§ 371, 2314 and 2315. The goods in which they dealt are pre-Columbian artifacts, and in neither this nor the prior trial was there evidence that the appellants or anyone else had taken the items from the personal possession of another. The legal theory under which the case was tried was that the artifacts were "stolen" only in the sense that Mexico generally has declared itself owner of all pre-Columbian artifacts found within its borders. Thus, anyone who digs up or finds such an item and deals in it without governmental permission has unlawfully converted the item from its proper owner.[1]

---

1. *See generally United States v. McClain,* 545 F.2d 988 (5th Cir.), *rehearing denied,* 551 F.2d 52 (5th Cir. 1977).

Only one other reported conviction has resulted from application of the National Stolen Property Act to dealings in pre-Columbian artifacts. In *United States v. Hollinshead,* 495 F.2d 1154 (9th Cir. 1974), Clive Hollinshead of Los Angeles, California, was successfully pros-

ecuted for transporting into the United States a known and cataloged Guatamalan stela. Hollinshead was on probation for this offense during the events leading to the instant prosecution. At least appellants Simpson and Bradshaw knew Hollinshead and were aware of his conviction and probation. Hollinshead was to have supplied several of the artifacts that appellants were selling when they were arrested.

By various formulations, appellants and the amicus curiae, the American Association of Dealers in Ancient, Oriental & Primitive Art, raise basically three issues in this appeal. They challenge: (1) the propriety of the application of the National Stolen Property Act (N.S.P.A.), 18 U.S.C. §§ 2314, 2315, to dealings in pre-Columbian artifacts; (2) the correctness and sufficiency of the jury instructions regarding the Mexican law of pre-Columbian artifacts; and (3) the sufficiency of the evidence to support the convictions as measured under their view of the Mexican law. Though in raising these issues the appellants did not distinguish between their convictions on the substantive count and their convictions on the conspiracy count, we find that their arguments regarding jury instructions compel reversal of the substantive count only. On the conspiracy charges, we find the shortcomings below merely harmless error and thus affirm the convictions on that count for the reasons expressed below. This mixed disposition requires a more detailed account of the facts than is present in the earlier opinion. We first review, therefore, the evidence adduced at trial, cast in the light most favorable to the government's verdict.

### I. The Appellants' Dealings in Pre-Columbian Artifacts.

In May 1973, Joseph Rodriguez, a resident of Calexico, California, arrived at a Dallas motel with a collection of pre-Columbian artifacts for display and sale.[2] He sold pieces at least to a local art dealer and to a law professor who was staying in the same motel. He thereafter moved his wares to a San Antonio motel, apparently as a result of his dealings with the professor, who taught in San Antonio. From the new location Rodriguez contacted prospective buyers, including Alberto Mejangos, who unbeknownst to Rodriguez was director of the Mexican Cultural Institute, an educational outpost of the Mexican government located in San Antonio. Suspecting Rodriguez of

illicit dealings, Mejangos and Adalina Diaz-Zambrano, the librarian at the institute, visited Rodriguez to see the collection, without identifying themselves as officials of the Mexican government. Rodriguez showed them a large collection of fine artifacts, many of which were caked with mud and straw. When he was asked how it was possible that he had all these ancient artifacts, Rodriguez said that he had five squads working in various Mexican archaeological zones and that the objects were passed, a few at a time "by contraband" to his Calexico store, which served as a front for his operation. When he amassed enough objects, he said, he would sell them in different localities. He priced the items he showed Mr. Mejangos and Ms. Diaz-Zambrano at figures ranging between $5,000 and $20,000, explaining that the prices had gone up as a result of the February 1972 presidential agreement between the United States and Mexico. He said he now had to give more money to the people who were passing the objects to him.

At some time after these meetings in San Antonio, Rodriguez returned to Calexico, leaving the collection behind with appellants William and Ada Simpson who were authorized to sell the items. The next known transaction regarding the Rodriguez artifacts occurred in early December 1973. Simpson and appellant Mike Bradshaw contacted William Maloof of Cleveland, Ohio, a college friend of Bradshaw, in an effort to raise money for an oil importation venture. They offered Maloof several of the artifacts as collateral for the loan Maloof considered making. Simpson, Bradshaw, and a third man whom Maloof spoke with only by phone,[3] told Maloof that the items had been "stolen" or "smuggled" out of Mexico. They said that a man named Rodriguez was "chief of the Mexican Secret Service" and had gotten the artifacts from "a vault" in Mexico. Patty McClain was mentioned as an appraiser who knew the value of the artifacts. Simpson and Bradshaw told Ma-

---

**2.** Rodriguez, a codefendant at the original trial, was not retried with the others because he was found mentally incompetent in the interim.

**3.** The man identified himself as Harry McClain, who is appellant Patty McClain's husband.

loof that they planned to take most of the objects to Europe, "auction" them off, and then return them to the United States. This process would yield bills of sale from European art dealers, which would facilitate later resale. Maloof, suspecting he was being swindled, contacted the FBI and showed the objects to them. After being alerted by the Cleveland office, the Houston office of the FBI delegated Special Agent John McGauley, to determine whether stolen pre-Columbian artifacts were being sold by the group. To assist in the covert investigation, McGauley brought in Travis Benkendorfer, who had proven to be a reliable informant on other occasions.

In February 1974, after failing to contact Harry McClain, Benkendorfer succeeded in reaching the Simpson residence by telephone. Identifying himself as a Mr. Benks, Benkendorfer told Mrs. Simpson a cover story that he was interested in acquiring stolen treasury bills, stocks, bonds, or other stolen or illegal merchandise for resale. He said that he represented an international combine with Mafia or other underworld connections and that any stolen merchandise they purchased would immediately be flown out of the country by private plane. Mrs. Simpson replied that her husband and his partner Patty McClain were then in California, waiting for a shipment of pre-Columbian artifacts to cross the border. She said that she would have her husband and Mrs. McClain contact Benkendorfer. When Simpson called Benkendorfer the next morning, Benkendorfer repeated his story. He explained that he had gotten Simpson's name through a Long Island man with Mafia connections and had been instructed to discover for his principal whether Simpson had any artifacts for sale. Simpson replied that he had approximately 150 pieces already in San Antonio and was in Calexico awaiting a new shipment from the diggings. He described a "conduit" by which the items were taken from the diggings to the archaeological institute in Mexico, where documents or permits were forged or backdated. The items were then trucked in disguise to the border at Calexico before distribution to various cities in the

United States, particularly San Antonio. Simpson stated that what they were doing "is illegal, but really not illegal, because if the Mexican authorities knew basically what we were doing, they would take them away from us, because the Mexicans really claim all of the items belong to them." Simpson explained further that the backdating of the papers was due to a new "presidential law" that had gone into effect in Mexico, prohibiting private ownership of artifacts after its effective date. He said that the group had planned to ship the items to Europe for sale but that they could save shipping and breakage costs if Benkendorfer and his principal bought the new shipment right at the border. Simpson said that Rodriguez and Patty McClain each had collections that also would be available. Benkendorfer said he would discuss the offer with his principal. He later relayed the message through Mrs. Simpson that he would prefer to have all the items shipped to San Antonio for a single viewing and purchase decision. Simpson agreed to this proposal, emphasizing that all of them would have to be extremely discreet. He said they would get into a lot of problems if the United States government caught them since what they were doing was against the law. He repeated that the Mexicans claimed ownership of the items. Simpson also mentioned during the conversation that his associate Mike Bradshaw was flying from Alabama to Calexico with money to pay for the items that were coming across the border.

Several days later, Benkendorfer received word from Mrs. Simpson that trouble had developed in the conduit or channel. Patty McClain confirmed this when she later contacted Benkendorfer to discuss terms for the sale of her collection. She said that the driveshaft of the truck carrying the artifacts had broken south of the border and that Simpson was sending a new truck to the interior to bring in the goods. In terms highly similar to Simpson's she also described the "channel" from the diggings and the system for getting backdated permits and trucking the items to Calexico developed by

Joe and "staff." She said that she and Simpson were responsible for distributing the goods to various points away from Calexico, especially if they were bound for the European market. When Benkendorfer repeated his cover story, McClain gave him some of her artifacts to show to his principal, Mr. Dooley (Agent McGauley). McClain made Benkendorfer promise not to show the items to an art dealer or museum because a recent similar showing had caused the FBI to investigate. McClain agreed that Benkendorfer and McGauley might bring their own appraiser to the San Antonio showing, though she was anxious that the appraiser not come from Mexico City. She explained that she was afraid he might return and report their doings to the authorities because "what we are basically doing is against the law." A final topic during this meeting involved a mild expression of interest by Benkendorfer in purchasing Mexican gold. When Benkendorfer next spoke with Simpson, in addition to repeating the story of the broken driveshaft, Simpson offered to sell Benkendorfer some gold bars that were coming out of Mexico via the same conduit as the artifacts. Simpson then put "his partner" Joe Rodriguez on the phone to explain the gold deal, which Benkendorfer rejected after hearing the details.

During his next phone conversation with Simpson, who was still in Calexico, Benkendorfer spoke with appellant Mike Bradshaw for the first time. Bradshaw's comments evidenced his knowledge of the conduit and the planned sale, and he stressed the need for discretion due to the danger.

Following this round of contacts the defendants seemed to grow even more cautious. Simpson interrogated Benkendorfer about where he had learned Simpson's name; McClain expressed concern about the amount of information Simpson and Bradshaw had conveyed to Benkendorfer by

phone; several of the appellants sought to assure themselves that Benkendorfer was not with the FBI. McClain even tried to renegotiate the timetable of the showing and sale so that the new shipment would not be sold until after the in-country items had been successfully conveyed. Such a split timetable was ultimately agreed upon after Benkendorfer told Simpson that his New York connection had authorized the purchase of artifacts currently held by Simpson, Rodriguez, and McClain and that a decision whether to buy the next shipment would come later.[4]

On the appointed date, March 4, 1974, Agent McGauley and Benkendorfer arrived at the San Antonio Holiday Inn, chosen by Simpson because it had a meeting room with an outside entrance that would be "discreet." Over supper with the four appellants and Mike Bradshaw's fiance, they discussed various aspects of the deal. McGauley repeated the cover story, adding that his New York syndicate was trying to corner the market on pre-Columbian artifacts. The defendants again voiced concern that McGauley's appraiser was coming from Mexico and might return to inform the Mexican government. McGauley assured them that the expert had been adequately paid and that he had methods of ensuring the man's silence. The defendants mentioned that the items were coming from a dig that the Mexican authorities did not know about. Simpson commented that if the FBI knew the artifacts were at the hotel they would seize them. McGauley assured them that he was not an FBI agent.

At supper the defendants further suggested that McGauley also go to the west coast to buy some very valuable stelae and large figurines accumulated there by Clive Hollinshead. Because McGauley had obtained only a single certified bank draft for the "purchase," the parties worked out an escrow agreement to handle the need to

---

4. During one of the conversations to perfect details of the San Antonio meeting, Simpson asked whether Benkendorfer and McGauley would be interested in purchasing a three-ton stela from the Mexican interior. Simpson was contemplating a burro trip down to the monu-

ment so the buyers could inspect it before it was cut into three pieces for transportation out of the country. Benkendorfer declined the offer when he learned that the object was still in place.

inspect the items at separate locations. After supper, Benkendorfer and McGauley briefly viewed the artifacts in the locked meeting room and retired for the night.

The next morning the "appraiser," Dr. Eduardo Montes Moctezuma of the Mexican Department of Archaeology, arrived with his "interpreter," another undercover FBI agent. While these two men, Agent McGauley, William Simpson and Patty McClain examined the artifacts one by one, Benkendorfer, Bradshaw and Mrs. Simpson stayed in the coffee shop. During the wait, Bradshaw informed Benkendorfer that he had invested a great deal of time and money to make Rodriguez' conduit secure, that he had been to the diggings and followed the conduit all the way up through Calexico, California. Bradshaw confirmed earlier Simpson comments that the Indians who were stealing the artifacts had no idea of their worth and were paid only a small sum to get the artifacts from the diggings, to "rob the graves." He also stated that Rodriguez had paid off several customs inspectors along the border to pass the items across.

During the appraisal in the meeting room, McClain and Simpson confirmed that, in addition to the artifacts still located in California, Rodriguez was bringing more across the border and that they would be available to McGauley. These had not crossed yet because of the truck breakdown. McGauley arranged to purchase the goods he had just inspected, contingent upon inspection of the items available in California.

Over lunch McGauley negotiated the sale terms with appellants agreeing on a price of $115,000 for the San Antonio lot, including McClain's items. Bradshaw and Simpson then arranged to meet McGauley, the "appraiser" and the "interpreter" in Los

Angeles the next day to view the Hollinshead artifacts. McClain and Mrs. Simpson agreed to remain behind and rewrap and store the items. The next day, March 6, 1974, Simpson and Bradshaw were arrested in Los Angeles during the course of negotiations to purchase the Hollinshead artifacts for $850,000. McClain and Mrs. Simpson were arrested in San Antonio the same day.

There was evidence at trial that none of the items "purchased" by Agent McGauley bore the indicia of registration with the Archaeological Registry maintained by the Mexican government since 1934—a permanent, coded number placed with indelible ink on an inconspicuous area of the piece. Nor were any documents of registration for these pieces in the names of either Rodriguez or any of the appellants found in the registry. Additionally, no export permits had been obtained for the items. In fact, since 1897 the Mexican government has issued only temporary export permits, and those are issued exclusively to cultural institutions or universities. Permits have never been issued to private individuals or for commercial purposes.

## II. Application of N.S.P.A. to Dealings in Pre-Columbian Artifacts.

Appellants attack the application of the N.S.P.A. to their conduct under two different theories. They first argue that Congress never intended the N.S.P.A. to reach items deemed "stolen" only by reason of a country's declaration of ownership. In any event, they claim, the N.S.P.A. was superseded by the 1972 Law on Importation of Pre-Columbian Monumental or Architectural Sculpture or Murals, 19 U.S.C. §§ 2091–95, which provides only the civil penalty of forfeiture[5] for importation of certain types of pre-Columbian artifacts.[6] Second, they

5. 19 U.S.C. § 2093 details the only penalties contained in the 1972 Importation Act. It provides that any object imported in violation of the Act shall be seized and subject to forfeiture under the customs laws.

6. This statute prohibits importation into the United States, unless the country of origin has certified exportation, of "stone carvings and wall art which are pre-Columbian monumental

or architectural sculpture or murals." The latter term is defined in § 2095(3) as any stone carving or wall art (or fragment or part thereof) that (1) is the product of pre-Columbian Indian culture of Mexico, Central America, South America, or the Caribbean Islands; (2) was an immobile monument or architectural structure or was a part of, or affixed to, any

and their amicus argue that due process is violated by imposing criminal penalties through reference to Mexican laws that are vague and inaccessible except to a handful of experts who work for the Mexican government.

 We view appellants' first argument as foreclosed by our doctrine of law of the case. Under that doctrine it is our practice to apply a rule of law enunciated by the court to the same issues in subsequent proceedings and appeals in the same case. Unlike the rule of res judicata, the doctrine applies only to issues that were decided in the former proceeding but not to questions that might have been decided but were not. *Carpa, Inc. v. Ward Foods, Inc.*, 567 F.2d 1316, 1320 (5th Cir. 1978). Though appellants articulated their theories in a slightly different manner in the first appeal, they provoked a square holding that, in addition to the rights of ownership as understood by the common law, the N.S.P.A. also protects ownership derived from foreign legislative pronouncements, even though the owned objects have never been reduced to possession by the foreign government. *United States v. McClain*, 545 F.2d 988, 994–97 (5th Cir. 1977). Moreover, the earlier panel had considered evidence of the 1972 statute, its legislative history and UNESCO negotiations, holding nevertheless that neither statute nor treaty nor our historical policy of encouraging the importation of art more than 100 years old had the effect of narrowing the N.S.P.A. so as to make it inapplicable to artifacts declared to be the property of another country and illegally imported into this country. 545 F.2d at 996–97. Appellants' attempt to raise these points again on appeal is therefore foreclosed *unless*

[1] the evidence on a subsequent trial was substantially different, [2] controlling authority has since made a contrary decision of the law applicable to such issues, or [3]

the decision was clearly erroneous and would work manifest injustice.

*Morrow v. Dillard*, 580 F.2d 1284, 1290 (5th Cir. 1978), *quoting White v. Murtha*, 377 F.2d 428, 431–32 (5th Cir. 1967).

Of these customary heads of exception, only the third is even a colorable issue. Appellants attempt to identify clear error in the panel's decision largely by pointing to the legislative history of the 1972 statute. From stray congressional remarks, such as that of Representative Byrnes of Wisconsin that the legislation deals with "items *stolen* in the country of origin, and we are saying that if it is stolen it cannot be brought in," [7] coupled with the statute's noncoverage of movable artifacts such as ceramic pots or figurines and provision of civil forfeiture as the only penalty, appellants seek to establish a very specific legislative understanding and intent. They argue (1) that Congress believed that pre-Columbian artifacts were not forfeitable under preexisting laws such as the N.S.P.A.; (2) that Congress must have intended to allow importation of movable items like most of those in the Rodriguez/Simpson/McClain collections; and (3) that Congress intended that illegal importation of immovables be punished by forfeiture of the item and not by imprisonment or fine under the criminal laws.

 Our study of the statute and its scant legislative history persuades us that appellants' reading of it is not correct. Both the Report by the House Ways and Means Committee and the Report by the Senate Finance Committee explicitly refer to the presence of other unspecified sanctions: "While legal remedies for the return of such objects are available in U.S. courts in some cases, these procedures can be extremely expensive and time consuming and do not provide a meaningful deterrent to the pillage of pre-Columbian sites now tak-

such monument or structure; and (3) is subject to export control by the country of origin.

Though some of the artifacts seized in San Antonio and Los Angeles seem to come within this definition, the majority of the pieces are movable items such as ceramic dishes, pots, or

figurines that may not have been part of or affixed to monuments or walls within the apparent meaning of the statute.

7. 118 Cong.Rep. 37098 (1972) (emphasis added).

ing place." [8] Moreover, the Act covers objects imported from all the countries of Latin America. These countries may have acted quite differently to protect their cultural heritages, some by declaring national ownership and others merely by enacting stringent export restrictions. Since it covers artifacts from such a large number of countries, the Act is better seen not as an indication that other available penalties were thereby precluded, but rather as a recognition that additional deterrents were needed. We cannot see in this congressional intent any desire to prevent application of criminal sanctions for dealing in items classified as stolen because a particular country has enacted national ownership of its patrimony.[9]

Appellants' second challenge is not so easily resolved. It is elementary that criminal statutes must give notice of the acts they prohibit before valid penalties may be imposed thereunder. In their first appeal, appellants argued broadly that a reference to any foreign law for the purpose of determining what is or is not "stolen" would "inject an unacceptable degree of uncertainty into the administration" of the N.S. P.A. This argument also drew a firm holding—a ruling that application of the N.S. P.A. to foreign exportation did not render that statute void for vagueness. 545 F.2d at 1001, 1002 n.30. The court reasoned that the statute's specific scienter requirement eliminates the possibility that a defendant is convicted for an offense he could not have understood to exist. In support, the court cited *Boyce Motor Lines v. United States,* 342 U.S. 337, 340, 72 S.Ct. 329, 331, 96 L.Ed. 367 (1952), for the proposition that it is not "unfair to require that one who deliberately goes perilously close to an area of proscribed conduct shall take the risk that he may cross the line." The court finally noted that it would have been impossible for the statute to have explicitly described every type of theft that might fall within its broad purview. *Id.*

In assessing whether the law of the case doctrine precludes further challenge under a void-for-vagueness theory, we first observe that the panel's holding was in response to a challenge about reference to foreign law *generally* and not to a challenge about the specific Mexican statutes. Moreover, we think it very significant that the panel's response was made in the context of its independent review of the relevant Mexican statutes. Its study of those statutes led the court to conclude that Mexico had not *unequivocally* declared national ownership of *all* artifacts until 1972. 545 F.2d at 997–1000. Entailed in the proposition that criminal penalties on the basis of the 1972 declaration of ownership are proper, is the probable corollary that criminal penalties on the basis of, for instance, the 1897 Mexican statute alone would have been improper because that statute did not declare the nation's ownership of movables

---

**8.** H.R.Rep.No.92–824, 92d Cong., 2d Sess. 3 (1972); S.Rep.No.92–1221, 92d Cong., 2d Sess. 2 (1972).

**9.** During the congressional debates, Rep. Byrnes also stated:

> The situation is that a narrow class of very valuable archaeological objects from the pre-Columbian period in South America are being taken out of that country [sic] illegally, and being brought into this country.
>
> There is no prohibition in this country about bringing in these articles, the prohibition is against taking these articles out of the country in which they are found, and this is an attempt to cooperate with these countries to avoid this exploitation that is taking place. 118 Cong.Rec. 37097 (1972).

Instead of reading into these remarks the specific and technical meaning attributed to them by appellants, we understand the congressman to be referring to the general state of American law regarding the importation of items illegally exported from another country. As the earlier panel observed, the fundamental rule, absent modification as by the 1972 statute, is that it is not a violation of law to import an item of art or anything else simply because it has been illegally exported from another country. 545 F.2d at 996.

But that generalized principle does not preclude federal criminal liability for concealing, selling, or transporting across state or international borders items that are not only illegally exported from a country such as Mexico, but are also incapable of being privately owned or conveyed. Dealing in such items is dealing in stolen goods and may be punished accordingly, irrespective of import regulations.

with sufficient clarity.[10] The panel's opinion is consistent with the view that, had there been no subsequent enactments that declared ownership with enough specificity to be accessible to and understandable by our citizenry, criminal penalties may well have violated our fundamental standards of due process. We are therefore convinced that, insofar as criminal liability in the second trial may possibly have been predicated on a conclusion that the 1897 Act declared Mexican ownership of all artifacts, appellants' precise due process challenge was not decided before and therefore survives. Because the due process challenge is so closely linked with the issue of the proper view of Mexican law, further discussion of this issue will be postponed until we have described and assessed the record on that point.

### III. Jury Instructions Regarding Mexican Law, Sufficiency of Evidence.

At appellants' first trial a deputy attorney general of Mexico testified as an expert witness, and the trial court subsequently instructed the jury that Mexico had, since 1897, vested itself with ownership of all pre-Columbian artifacts found in that country. As mentioned above, its independent review of translations of the various Mexican statutes convinced the earlier panel that Mexico had not unequivocally claimed ownership of *all* such artifacts until 1972. The earlier Mexican statutes seemed only to have claimed national ownership of immovable monuments and such movable artifacts as were found on, and possibly in, the immovable objects.[11] Movable objects not in the above classes seemed capable of being privately owned and conveyed, though the Mexican government required that such objects be registered and retained the right to acquire items of great cultural or archaeological value by purchase at a fair price. Certain other provisions referred to in the petition for rehearing seem to have established a presumption against private ownership of any movable not registered within the applicable time limits.[12] In view of the complicated and gradual nature of Mexico's apparent declarations of ownership, the earlier panel ruled that the defendants were entitled to a new trial because of the preju-

---

**10.** Article 1 of the Law on Archaeological Monuments, May 11, 1897 (Diaro Oficial de 11 de Mayo de 1897, *see* XIV Annario de Legislacion y Jurisprudencia [1897]), declared "archaeological monuments" to be the "property" ("propriedad") of the nation, but "archaeological monuments" were defined in article 2 as "ruins of cities, Big Houses [Casas Grandes], troglodytic dwellings, fortifications, palaces, temples, pyramids, sculpted rocks or those with inscriptions, and in general all the edifaces that in any aspect may be interesting for the study of civilization and history of the ancient settlers of Mexico." There was no corresponding declaration of ownership of movable artifacts such as codices, idols, amulets, though exportation of such items was forbidden unless legally authorized. Art. 6.

**11.** For instance, the Law for the Protection and Preservation of Archaeological and Historical Monuments, Typical Towns and Places of Scenic Beauty, January 19, 1934 (82 Diario Oficial 152, 19 de enero de 1934), broadened the definition of "monuments" to include "all vestiges of the aboriginal civilizations dating from before the completion of the Conquest." Art. 3. But art. 4 clearly declared national ownership of artifacts in more limited categories—"immovable archaeological monuments" and "objects which are found [in or on] immovable archaeo-

logical monuments." *See* 545 F.2d at 998–99, including n.20 that explains the dispute over movable items found *in* immobile monuments.

**12.** Art. 9 of the 1934 statute, *supra* note 11, created a Register of Private Archaeological Property ("Propriedad") with which private individuals were to register movable monuments in their "control" or "ownership." (Translation of any terms suggestive of private ownership was hotly disputed at trial.) Art. 12 of that statute prescribed that objects not registered within the period stipulated in the Act's transitory articles "shall be presumed to come from archaeological monuments which are real property." Because the Act had earlier declared national ownership of all immovable monuments, *supra* note 11, the force of this presumption seems to nationalize all movable artifacts not registered by the end of the transitory period.

There is a similar presumption in the statute that superseded the 1934 Act, the Federal Law Concerning Cultural Patrimony of the Nation, December 16, 1970 (303 Diario Oficial 8, 16 de diciembre de 1970). *See* art. 55 thereof, which provides that movable objects not registered within the allowed time limits are presumed "the property of the nation." ("propriedad").

dice that may have resulted from the erroneous instruction that Mexico owned all artifacts as early as 1897. Its analysis of the changes in Mexican law convinced the panel that the jury should have been told to determine when the artifacts had been exported from Mexico and to "apply the applicable Mexican law to that exportation." 545 F.2d at 1003.

When the additional complication of the statutory presumptions was raised in the petition for rehearing, the court explained that its earlier discussion of Mexican law had not been "an exegesis of every relevant statutory clause or a holding on every issue that was or might have been raised." Rather, the court contemplated that on remand "objective testimony" on the meaning of the relevant Mexican enactments would be introduced, so as to lighten the burden both of the district court and reviewing court. The court reiterated that the earlier instructions had been "clearly in error" as to Mexican law but added that at any subsequent trial "experts will have an opportunity to correct any misconstruction of which this Court may have been guilty in venturing forth in the arcane field of the Mexican law of pre-Columbian artifacts." *United States v. McClain, on petition for rehearing*, 551 F.2d 52, 54 (5th Cir. 1977).

Pursuant to these instructions, at the second trial the judge admitted testimony from several government and defense witnesses about the relevant Mexican law. Only two of the witnesses were accepted by the court as experts specifically on the Mexican law of archaeological monuments. The first, Javier Andres Oropeza-Secura, is the Director of the Judicial Branch of the National Institute of Anthropology and History of Mexico, the office in charge of the official registry for ancient artifacts. The second was Ricardo de los Rios, an attorney who currently works at the Ministry of Labor and who formerly worked in the Attorney General's office, where he prosecuted about 150 cases under the Mexican laws regulating artifacts. Since each of these men is an employee of the Mexican government and was challenged by defendants as possibly biased, the government introduced other witnesses to corroborate their testimony. Carlos Schon, an attorney in Mexico City with a general practice and a heavily American clientele, was allowed to testify as a licensed practitioner of the general laws of Mexico from whom one may seek legal opinions. His testimony on archaeological law was based on his review of the various statutes and the Mexican Constitution. Though the testimony of these witnesses varied on a specific point here and there, the weight of their testimony as a whole indicated a general opinion that the Mexican government owned all pre-Columbian artifacts at least as early as 1897.[13] Rights of private individuals were

---

13. The witnesses, though very emphatic in affirming their understanding of longstanding national ownership of all artifacts, were unable to identify specific passages (apart from the 1934 and 1970 presumptions) in the 1897, 1930, 1934, or 1970 statutes that claimed outright ownership of the sort of movables largely involved in this case. By contrast, those statutes contain several explicit declarations of ownership of immovables and smaller movable items found on, and possibly in, the immovable monuments. *Supra*, notes 10 and 11.

On cross-examination, appellants tried to lead the government witnesses to admit that the specific pronouncements of ownership of some objects indicated an obvious legislative intent to leave undisturbed private ownership of other objects, especially since various provisions seem clearly to contemplate private ownership. For instance, art. 26 of the 1930 statute provides that "[i]n order to determine the ownership ('propriedad') of movable things of artis-

tic, archaeological or historical value that are discovered in a casual manner and not as a result of archaeological excavation or exploration, the provisions of the Civil Code of the Federal District and Federal Territories related to treasures will apply, but the Federal Government may acquire the discovered objects for their fair price, when it deems this appropriate."

The witnesses stood their ground, however, arguing that the expressions of limited ownership did not preclude general ownership of all artifacts. Without succeeding in rationalizing the statutory provisions with his categorical view of government ownership, Carlos Schon at least attempted to identify an arguable source of national ownership by reference to art. 27 of the Mexican Constitution of 1917. That provision, as explained by Schon, provides that the property of the land and the water within the limits of the national territory

limited to the right of possession, but only if the particular artifact had been properly registered, and the mere right to possess does not confer the right to sell an item or to give it as security for a loan.

These views were further corroborated by two civilian witnesses, one Mexican and one American. Ms. Diaz-Zambrano testified that she had learned in elementary school that the Mexican people own all vestiges of pre-Hispanic civilizations found in the country. Dr. Richard E. W. Adams, Professor of Anthropology and Dean of Humanities and Social Science at The University of Texas in San Antonio, testified that he had participated in several archaeological excavations in Mexico. He stated that in 1953 at a class he attended at the School of Anthropology and History in Mexico City, he was told that all archaeological items are the property of the nation and cannot be exported. He also testified that, insofar as it affected his work and the difficulty of exporting legitimately excavated objects from Mexico, the Mexican law had not changed in the last twenty years.

Against this massive record, appellants offered, in addition to their own views of Mexican law, the testimony of Ignacio Gomez Palacio, an attorney in Mexico who engages in legal research, writing, and a general practice. Like Mr. de los Rios, his

opinion was based on independent review of the Mexican Constitution and relevant statutes, rather than on any long-held expertise on the particular subject of pre-Columbian artifacts. His testimony was similar to the conclusions reached earlier by the Fifth Circuit panel, and he seems to be the only witness to explain persuasively several passages in the statutes that are anomalous under the categorical views advanced by the government witnesses.[14]

On this new record the trial judge faced a dilemma. The Fifth Circuit had ruled him in error for having concluded that Mexico had claimed ownership as early as 1897, and the panel had re-emphasized its ruling even while instructing him to allow experts to correct any error in the appellate opinion. Yet the great weight of the government's new expert testimony indicated that his earlier conclusion might still be the proper view of Mexican law—at least as interpreted by some of the few Mexican nationals qualified to express an authoritative opinion. Perhaps in view of this dilemma about the paths open to him and because none of the parties urged that it was his function to decide the question of applicable foreign law, the trial judge gave the jury the task of deciding whether and when Mexico *validly* enacted national ownership of the artifacts involved.[15] In addition to now urging

belongs originally to the nation, which has the power to transmit them to private individuals as private property. He interpreted art. 27 as extending to manmade items buried in the land, in addition to the natural deposits of minerals and ores found therein. Under his view, unless the legislature acts to grant to individuals derived ownership rights regarding any of these things, national ownership is retained.

The testimony of Ricardo de los Rios also touched on art. 27, and there are indications he may have held similar views of its meaning. The questions he was asked did not cause him to focus on the issue with sufficient precision for us to determine his position, however.

14. As observed in note 13, *supra*, it was difficult for the government witnesses to account for the statutory declarations of ownership of *some* items if the government supposedly owned *all* types of artifacts already. The declaratory passages made much more sense under Gomez' view that the government only gradually expanded its ownership claims. Contrary to Schon's analysis, Gomez read art. 27 of

the 1917 Constitution as restricted to land, subsoil, and materials naturally occurring therein, such as minerals, precious stones, ores, oil. He classified manmade items that were found in the soil as "treasure trove" and noted that ownership claims to such items were regulated by provisions of the Civil Code of the Federal District. He analyzed art. 26 of the 1930 statute, set out in note 13, *supra*, as incorporating by reference the treasure trove statutes and as further evidence of the ability of private persons to own at least some artifacts under the earlier statutes.

15. The judge instructed the jury as follows:

Now, in order to find any one or more of the defendants guilty on one or more of the counts in the indictment, the government must prove three essential elements of the offense charged in this case beyond a reasonable doubt as follows:

1. *That the Republic of Mexico was the owner of the alleged artifacts, if any, at the*

for the first time that the court erred in failing to make the determination of foreign law, the appellants argue that certain aspects of the instructions were erroneous and that the court erred in refusing to give the instructions they had offered.[16]

Rule 26.1 of the Federal Rules of Criminal Procedure provides in part that "[t]he court, in determining foreign law, may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under [Rule 26.] The court's determination shall be treated as a ruling on a question of law." Despite appellants' fond hopes, Rule 26.1 does not itself mandate that the judge rath-

er than the jury decide all questions of foreign law. Rather, it provides that any determination a judge *does* make shall be treated as a ruling on a question of law. This "functional approach," carefully side-stepping the issue of who is to decide the question, was deliberate on the part of the draftsmen.[17]

◼ Our pre-Rule cases make clear that the proper procedure is for the judge rather than the jury to determine questions of foreign law. *Daniel Lumber Co. v. Empresas Hondurenas, S.A.,* 215 F.2d 465 (5th Cir. 1954), *cert. denied,* 348 U.S. 927, 75 S.Ct. 340, 99 L.Ed. 727 (1955); *Liechti v. Roche,*

*time such artifacts were exported* if and only if you so find, from the Republic of Mexico into the United States of America;

2. That such artifacts, if any, were in fact exported from Mexico and thus imported into the United States of America from the Republic of Mexico; and

3. That such alleged artifacts were produced before the Spanish Conquest of Mexico and the government of the Republic of Mexico had not issued or granted a permit or license allowing and authorizing the defendants or any other person, firm, corporation, governmental agency or others to export such artifacts, if any, from Mexico to the United States of America or to any other country or place; and such artifacts, if any, had not been registered under Mexican law.

As I have said, all three and each and every one of the essential elements that I have just given you must be proved and established to your satisfaction beyond a reasonable doubt before you can find the defendants guilty in this particular case.

Now, there is absolutely no presumption that the defendants or any one of them knew the Mexican law. On the other hand, the United States of America is under no obligation to prove that the defendants knew the place from which the artifacts were allegedly stolen, if it is shown beyond a reasonable doubt that they were in fact stolen. What the United States must prove to your satisfaction beyond a reasonable doubt is that the defendants knew that the artifacts were in fact stolen under the laws of Mexico regardless of where they came or from where they were stolen *and that the Mexican government had in fact effectively adopted valid laws acquiring ownership of such artifacts,* if any, *which were in existence at the time of such theft,* if any, and that the defendants knew and understood such laws and that such laws had been violated.

(emphasis added).

**16.** On numerous occasions during the trial the judge had clearly indicated his intent to give this issue to the jury. Beyond one tentative expression of doubt by an assistant prosecutor, none of the parties objected to putting this burden on the jury. The judge had also requested assistance from the parties in formulating the instructions on Mexican law, but none responded until the last moment, when they proffered handwritten requests in part tracking the earlier panel opinion. The judge thought his own set of instructions carefully followed the panel opinion because the jury was being told, in effect, to apply the applicable Mexican law to the defendants' behavior. In objecting to the charge, defendants' only points were that their proffered instructions were more precise renditions of the panel's legal conclusions than were the trial judge's. When, during the bench conference after the instructions had been given, the judge commented, "I put quite a burden on [the jury—to find whether the Mexican laws were valid enactments]," appellants' attorneys failed to comment on the procedure.

**17.** The Advisory Committee Notes on the Fed. R.Civ.P. 44.1 to which we are referred by the draftsmen of the Rules of Criminal Procedure observe that Rule 44.1, to which Rule 26.1 is substantially identical, does not address itself to this problem because the rules generally refrain from allocating functions between judge and jury. The committee adds, "It has long been thought, however, that the jury is not the appropriate body to determine issues of foreign law," citing, among other authorities, our pre-Federal Rules cases, *Daniel Lumber Co. v. Empresas Hondurenas, S.A.,* 215 F.2d 465 (5th Cir. 1954), *cert. denied,* 348 U.S. 927, 75 S.Ct. 340, 99 L.Ed. 727 (1955), and *Liechti v. Roche,* 198 F.2d 174 (5th Cir. 1952). Advisory Committee Note to Rule 44.1, Fed.R.Civ.P., Title 28, U.S.C.A.

198 F.2d 174 (5th Cir. 1952). To close the gap left in the Federal Rules of Criminal Procedure, we reaffirm that division of functions now, as we have done in the corresponding civil context. *First National City Bank v. Compania de Aquareros, S.A.,* 398 F.2d 779, 782 (5th Cir. 1968). But it does not necessarily follow that putting the matter to the jury is reversible error. There is no automatic prejudice to the substantial rights of a defendant inherent in letting the jury decide the question on the basis of expert testimony. Indeed, the question whether the right to a jury trial in criminal matters *requires* submission of a question of foreign law to the jury, because it can be found as a matter of *fact,* has never been definitively laid to rest.[18] In the absence of compelling evidence of prejudice, we would be loath to reverse a conviction such as this where the evidence of guilt and of intent to violate both foreign and domestic law is near overwhelming. We believe, nevertheless, that reversal of at least the substantive count is required here because the most likely jury construction of Mexican law upon the evidence at trial is that Mexico declared itself owner of all artifacts at least as early as 1897. And under this view of Mexican law, we believe the defendants may have suffered the prejudice of being convicted pursuant to laws that were too vague to be a predicate for criminal liability under our jurisprudential standards.

It may well be, as testified so emphatically by most of the Mexican witnesses, that Mexico has considered itself the owner of all pre-Columbian artifacts for almost 100 years. If so, however, it has not expressed that view with sufficient clarity to survive translation into terms understandable by and binding upon American citizens.[19] Neither the early statutes nor the Constitution of 1917 clearly declare national ownership of the sort of pre-Columbian movable artifacts in which appellants dealt. One of the government experts testified that a literal translation of the Mexican statutes into English would mislead those not familiar with Mexican law into thinking that such movables had been capable of being privately owned.[20] Another admitted that there were "confusions" in the 1934 statute caused by the lack of technical language and that subsequent statutes had been designed to clarify the legal situation.[21]

The 1972 statute, on the other hand, is clear and unequivocal in claiming

18. *See, e. g.,* Kaplan, "Continuing Work of the Civil Committee: 1966 Amendments of the Federal Rules of Civil Procedure (II)," 81 Harv. L.Rev. 591, 617 (1968). Because no one argues the point here, we express no opinion on the issue.

19. Because of our disposition of the claims in this appeal largely on the ground of unconstitutional vagueness and harmless error, we need not now undertake the delicate task of deciding the meaning of the Mexican statutes and the manner in which the various provisions interact. We leave that task to subsequent courts should the government prosecute others by reference to pre-1972 Mexican statutes, either directly or as incorporated by art. 4 of the 1972 Transitory. *See* note 22 *infra.*

20. Carlos Schon took issue with the translations offered in evidence by the defendants—the translations used by the earlier panel in assessing the Mexican statutes. He especially objected to translating the word "propiedad" as "ownership" or "property," though he conceded that that rendering was proper in *some* of the statutory passages. He said that only one familiar with the Mexican law could decide when to translate the word as "ownership" because in many instances regarding artifacts the law limits "propiedad" to connoting mere *possessory* rights. Translation of "propiedad" as "property" might incorrectly lead those unfamiliar with Mexican law to believe some artifacts could be "outright property." Mr. Schon further testified that "translacion de dominion" could be translated as "acts of conveyance," provided the latter term was not understood to include "transfer of property or outright ownership." The literal translation, "transfer of dominion," would also be misleading, since the correct meaning of the law does not go beyond allowing "transfer of possession."

21. As an instance of such "confusion" in the 1934 statute, Mr. Oropeza identified art. 10, which can be translated as requiring registration of private "transfers of ownership." In the original it reads: "Los proprietarios de objetos inscritos deberan dar conocimiento de las traslaciones de propriedad, para que se haga la anotacion correspondiente."

ownership of all artifacts.[22] Deferring to this legitimate act of another sovereign, we agree with the earlier panel that it is proper to punish through the National Stolen Property Act encroachments upon legitimate and clear Mexican ownership, even though the goods may never have been physically possessed by agents of that nation. Nor does the infirmity of vagueness attach to the 1970 and possibly the 1934 statute insofar as they established presumptions that unregistered movables belong to the sovereign. Had these theories alone (either post-1972 exportation or post-1934 appropriation, coupled with failure to register) been presented to the jury, our appellate task would have been much simpler.[23] There is no doubt that the evidence is sufficient to have sustained convictions under either theory, and there would have been little prejudice involved in letting the jury decide the appropriate Mexican law to apply. But the expert testimony in the main allowed the jury to conclude that Mexico had long owned all these items outright. There was thus little need for the jury to consider legal and factual technicalities such as the probable date of exportation or the effect of the presumptions upon appellants' unregistered items. Unfortunately, under this broad view of Mexican law, our basic standards of due process and notice preclude us from characterizing the artifacts as "stolen." Though the National Stolen Property Act is not void for vagueness because the general class of offenses to which it is directed is plainly within its terms, it cannot properly be applied to items deemed stolen only on the basis of unclear pronouncements by a foreign legislature. The principle from *Boyce Motor Lines,* employed in the earlier appeal, cannot be used to deflect the vagueness charges directed at the early Mexican statutes. The basic premise of *Boyce*—the existence of an area of conduct that is proscribed in reasonably certain terms—is absent. *Boyce Motor Lines v. United States,* 342 U.S. at 340, 72 S.Ct. 329. The 1897 statute, the 1930 statute, and even the 1934 and 1970 statutes, unless there is specific focus on the presumption mechanism, do not clearly announce any line that appellants' willfulness can have led them to cross. As the Supreme Court observed in *Screws v. United States,* 325 U.S. 91, 105, 65 S.Ct. 1031, 1037, 89 L.Ed. 1495 (1945), "willful conduct cannot make definite that which is undefined." We therefore conclude that the convictions pursuant to the substantive count must be reversed.

By contrast, the requisite degree of prejudice for reversal is lacking as to the conspiracy count. The evidence presented to the jury amply showed that appellants' conspiracy was much broader than an intent to deal in the single collection already in the United States for an unspecified length of time. It is abundantly clear that they conspired to bring in at least one other load, and most likely a continuing stream of articles that, owing to a broken drive shaft and appellants' subsequent arrest, never arrived. Their plans regarding those loads—and the conduit itself—were clearly illegal under any view of Mexican law, including that presented by their own witnesses. The evidence is massive that appellants knew and deliberately ignored Mexico's post-1972 ownership claims. In addition, the continuing nature of their enterprise was highlighted in the closing arguments to the jury by the government and the defendants alike.[24] Moreover, the instructions regard-

22. The 1972 statute also contains a grandfather clause under which rights gained under previous statutes are preserved. Transitory, Article Fourth. Thus, if private persons were allowed ownership as opposed to mere possessory rights under the earlier laws, those rights would be retained provided the owner complied with the requirements of those laws.

23. We express no opinion regarding the claim, made by amicus in its brief in the earlier appeal, that predicating criminal liability on a presumption contained in a foreign statute would also infringe due process.

24. During closing arguments, William Simpson, who was defending himself, referred to the testimony about the continuing conspiracy and sought to turn it to his own advantage:

Mr. Rodriguez, according to Mrs. Zambrano's testimony, . . . told her that there were five groups of Mexicans, peons, farmers, people trying to make money apparently

ing the conspiracy count were separated from the instructions regarding the substantive count and, in outlining the required elements of the offense, the judge made no reference back to the jury's role regarding Mexican law. He correctly charged that the defendants need never have completed the illegal object of their conspiracy to be found guilty and also correctly instructed that none of the overt acts need themselves be illegal. The phone calls and meetings with McGauley and Benkendorfer and indeed the sale of the Rodriguez/Hollinshead/McClain collection can each be seen as overt acts in stringing along the "Mafia" buyers until the channel for regular importation of newly dug items was fully operational, as the buyers had requested.

Given the strength of this evidence regarding the continuing illegal purpose of appellants which, if effectuated, would necessarily entail dealing in "stolen" property under *any* view of Mexican law, we hold that the dubious shifting of the determination of Mexican law constituted harmless error as to the conspiracy count.[25]

Accordingly, appellants' convictions on the conspiracy count are AFFIRMED, and the convictions on the substantive court are REVERSED.

digging in Mexico and supplying him with great quantities of artifacts.

The same thing holds true with that story. It can't possibly be true. Mrs. Zambrano under my examination, cross examine [sic] stated emphatically that that was happening at the present time, that that was a continuing operation; yet we have an inventory and it has been established that these pieces are the same pieces that Mr. Rodriguez left with me at that time, May of 1973.

If Mrs. Zambrano's testimony was accurate, and I'm not saying it wasn't told to her, I don't believe it was, but if it was accurate, by necessity, being a conspiracy as we are charged here today, that inventory would have increased considerably. Five groups of Mexicans in a conduit as represented by Mrs. Zambrano channeling it into San Antonio, my goodness gracious, it would have filled up my house. We would not only have had the bedroom and the living room filled, it would have been added to and added to in great quantities.

25. For these and additional reasons, we reject appellants' other challenges to the jury instructions. We can detect no affirmative errors in the statements about Mexican law made by the court. Nor did the judge err in refusing to give the instructions offered by appellants. The proffered summaries of Mexican law were fatally flawed in their treatment of the presumptions in the 1934 and 1970 statutes. Those presumptions, as part of statutes repealed by enactment of subsequent statutes, no longer have *independent* legal force. But they were not thereby rendered totally nugatory. The character of items excavated and held without registration for the statutory period may have been irrevocably impressed with a presumption of government ownership. In any event, no legal ownership of such items seems possible after the effective date of the 1972 statute. All items not legally owned by individuals were then nationalized, and it became impossible legally to own items without complying with the requirements of the earlier statutes. Transitory, Art. Fourth.